### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

------------------------------------------------------

**GREGORY J. DUHON, M.D.,**

      **Plaintiff,**

      **v.**

**THE BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY AND
AGRICULTURAL AND MECHANICAL
COLLEGE; THOMAS C. GALLIGAN JR.,
sued in his official capacity only; NEERAJ
JAIN, M.D., sued in his official and individual
capacities; HEALTHCARE PROFESSIONALS
FOUNDATION OF LOUISIANA;
PROFESSIONAL RENEWAL CENTER, and
LOUISIANA STATE BOARD OF MEDICAL
EXAMINERS,**

      **Defendants.**

------------------------------------------------------

**CASE NO. 20-cv-_____**

**JUDGE _____**

**MAGISTRATE JUDGE _____**

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiff, GREGORY J. DUHON, M.D., through undersigned counsel, brings this

Complaint and Demand for Jury Trial against Defendants Board of Supervisors of Louisiana State

University and Agricultural and Mechanical College; Thomas C. Galligan, Jr.; Neeraj Jain, M.D.;

Healthcare Professionals Foundation of Louisiana; Professional Renewal Center; and the

Louisiana State Board of Medical Examiners, and states as follows:

### PRELIMINARY STATEMENT

    1.    Plaintiff Gregory J. Duhon, M.D. was enrolled in a medical fellowship training

program at Louisiana State University School of Medicine ("LSU"). In July 2019, he was forced

to resign by his supervisor, Defendant Neeraj Jain, M.D. ("Dr. Jain"), who created an unbearably

hostile environment. Among other things, Jain baselessly accused Plaintiff of being "mentally impaired," and ordered him to report to the mental health "assistance" department at LSU or be fired.

2.  On Dr. Jain's allegation alone, and nothing more, LSU ordered Plaintiff to submit to a full psychological evaluation. Plaintiff was told that he would be fired if he refused. LSU made arrangements for one evaluation, which did not confirm any impairment. LSU then demanded another evaluation, once again threatening to fire Plaintiff if he refused. LSU referred Plaintiff to Defendant Healthcare Professionals Foundation of Louisiana ("HPFL").

3.  HPFL was created to receive physician referrals from Defendant Louisiana State Board of Medical Examiners ("Board"). The Board refers physicians with actual or suspected substance abuse or mental health issues and HPFL develops and supervises plans for their evaluation, treatment, and long-term monitoring. With no supporting evidence at all, HPFL ordered Plaintiff to report for a three-day inpatient psychological examination at Defendant Professional Renewal Center ("PRC") in Lawrence, Kansas.

4.  PRC conducted a sham evaluation that resulted in a meandering and incomprehensible "diagnosis." PRC's conclusion was crystal clear, however: Plaintiff "needed" 60-90 days of inpatient "treatment"—right there at PRC—at a cost to Plaintiff of more than $50,000. By that time, Plaintiff had been forced to resign from his toxic fellowship position at LSU. However, HPFL threatened to report him to the Board for disciplinary action if he did not do what PRC said.

5.  Plaintiff had neither the funds nor inclination to spend two or three months in inpatient "treatment" when, as a physician himself, he did not believe it was medically necessary. Following through on its threat, HPFL reported him to the Board as a potentially impaired

physician who was "non-compliant" with HPFL, ignoring that Plaintiff had not been referred by the Board in the first place and was not otherwise obligated to "comply" with HPFL and PRC.

6.      The Board opened an investigation based on HPFL's complaint, and told Plaintiff that the "best way" to resolve the threat to his physician's license was to do what HPFL and PRC told him to do. Hoping to mollify HPFL and convince it there was no need for inpatient treatment, Plaintiff commissioned psychological evaluations from two well-respected and independent psychiatrists at Louisiana universities, both of whom found no impairment issues or other reason for interference in his life or his practice of medicine.

7.      HPFL refused to consider these evaluations, but abandoned its reliance on PRC's evaluation and ordered Plaintiff to report for yet another evaluation to The Recovery Center ("TRC") in Baton Rouge, Louisiana. With the Board's approval, HPFL continued to wield the coercive threat of disciplinary action against his license if Plaintiff refused. Plaintiff met with TRC, but it refused to read or consider Plaintiff's evaluations from the two independent psychiatrists, and insisted that TRC provide (and charge Plaintiff for) its own analysis and treatment regimen.

8.      Plaintiff declined because TRC was a substance abuse treatment center and no one had even suggested, much less supported with evidence, that he had any substance abuse problem, which he did not.  In fact, even the PRC report (in addition to the two independent psychiatrists) had ruled out such an issue. Plaintiff, through his attorneys, attempted to negotiate some other solution with the Board. But the final straw was when the Board, still threatening to summarily suspend Plaintiff's license at any time, insisted in July 2020 that Plaintiff go to another multi-day inpatient evaluation at PRC or a similar center. Such required inpatient evaluation was likely to result in another incomprehensible "diagnosis" and self-interested requirement that Plaintiff spend 60-90 days more for "treatment" at a cost to Plaintiff exceeding $50,000.

9.     By their actions, and as detailed against each below, Defendants violated Plaintiff's right to procedural Due Process under the 14th Amendment; violated his right to non-discrimination under Titles II and III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("Americans with Disabilities Act" or "ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*. ("Rehabilitation Act" or "RA"), and Section 1557 of the Patient Protection and Affordable Care Act, 42 USC § 18116 *et seq*. ("Section 1557" or "ACA"). Defendants also acted negligently and fraudulently under Louisiana state law.

10.    Plaintiff seeks injunctive and declaratory relief (including reinstatement to finish his training at LSU), compensatory damages, punitive damages, and attorneys' fees and costs to redress Defendants' unlawful discrimination and related violations of state law.

## THE PARTIES

11.    Plaintiff Gregory J. Duhon, M.D. is a citizen of the United States; a resident of Metairie, Louisiana; and a physician licensed to practice medicine in the State of Louisiana by the Board.

12.    At all times relevant to this action, Plaintiff was regarded by each and every Defendant as having one or more mental impairment(s), that were not transitory or minor, within the meaning of 42 U.S.C. § 12102(1)(C).

13.    The ADA makes it clear that mental health disabilities are just as protected as physical disabilities.

14.    Despite his perceived disability and theoretical limitations, Plaintiff has been able to thrive as a student and trainee, as is evident from his completion of undergraduate medical education that resulted in his M.D. degree, and from his completion of medical residency training immediately prior to his fellowship.

15.     Plaintiff possesses all of the qualifications necessary to be a medical fellow. Indeed, he successfully applied to, and was accepted into LSU.

16.     As such, Plaintiff is a qualified individual with a perceived disability within the meaning of the ADA/RA/ACA, capable of performing all that was required of him in the fellowship.

17.     Plaintiff is also a qualified individual with a disability within the meaning of the ADA/RA/ACA because he now, as a result of Defendants' actions, has a record of having a physical or mental impairment within the meaning of 42 U.S.C. § 12102(1)(B) .

18.     Defendant THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, d/b/a Louisiana State University School of Medicine (hereinafter "LSU"), is a Louisiana political subdivision. LSU's office address is located at 104B University Administration Building, 3810 W. Lakeshore Dr., Baton Rouge, LA 70808. LSU is a public entity and, thus, is subject to the requirements of the Fourteenth Amendment and Title II of the ADA.

19.     LSU is the recipient of federal funds and, thus, is subject to the requirements of the Rehabilitation Act.

20.     LSU is operating a health program or activity, any part of which is a recipient of federal financial assistance. As such, LSU is covered by the requirements of the ACA.

21.     Plaintiff sues LSU for compensatory and nominal damages, and attorneys' fees and costs.

22.     Defendant THOMAS C. GALLIGAN JR., (hereinafter "GALLIGAN"), sued in his official capacity only, is the president of LSU. As such, he is the chief executive and has capacity

to effectuate injunctive relief. GALLIGAN is sued in his official capacity only pursuant to the doctrine of *Ex parte Young*.

23.     Plaintiff sues GALLIGAN for injunctive and declaratory relief, and attorneys' fees and costs.

24.     Defendant NEERAJ JAIN, M.D. (hereinafter "DR. JAIN"), sued in both his official and individual capacities, was the Program Director of Plaintiff's fellowship program, and as such was Plaintiff's direct supervisor.

25.     Plaintiff sues DR. JAIN for compensatory and punitive damages, and attorneys' fees and costs.

26.     Defendant LOUISIANA STATE BOARD OF MEDICAL EXAMINERS ("Board") is a Louisiana political subdivision. The Board's office address is 630 Camp St, New Orleans, Louisiana 70130. The Board is a public entity responsible for the licensing of physicians, and is subject to the requirements of the Fourteenth Amendment and Title II of the ADA.

27.     Defendant Healthcare Professionals Foundation of Louisiana ("HPFL") is a private not-for-profit corporation organized under the laws of the State of Louisiana. HPFL was originated by the Board to oversee the evaluation, treatment, and monitoring of physicians licensed by the Board, or who desired to be licensed, when such persons had, or were perceived or suspected to have, substance abuse or other impairment issues. As such, HPFL is a professional office of a health care provider or other service establishment within the meaning of 42 U.S.C. § 12181(7)(F).

28.     Professional Renewal Center ("PRC") is a psychiatric facility with its primary place of business and principal clinical site located in Lawrence, Kansas. PRC receives physician referrals from HPFL and conducts broad, multi-day inpatient psychological examinations. As such, PRC is a professional office of a health care provider or other service establishment within

6

the meaning of 42 U.S.C. § 12181(7)(F).  It has an ongoing referral business with the HPFL which it solicited in Louisiana.

## JURISDICTION & VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law. This Court has supplemental jurisdiction over Plaintiff's claims arising from state law in accordance with 28 U.S.C. § 1367.

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this District, and/or a substantial part of the events that give rise to the claims occurred in this District, and/or Defendants committed discriminatory acts within the jurisdiction of this District.

31.     As to Count I, the Court has jurisdiction over the Title I ADA claim because om March 18. 2020, Plaintiff filed a Charge with the EEOC (Exhibit A), and on July 9, 2020, received his Right to Sue Letter (Exhibit B), and this suit is filed within 90 days of the receipt of the Right to Sue Letter.

## STATEMENT OF FACTS

32.     Plaintiff started training in his LSU fellowship position in mid-2018. From the outset, and continuing into 2019, Plaintiff had a strained relationship with Dr. Jain, who was the Program Director and Plaintiff's immediate supervisor.

33.     In May 2019, with no supporting accusation or suspicion of a potential substance abuse or mental health issue, Dr. Jain told Plaintiff that he would be terminated from the fellowship program unless he reported to LSU's Campus Assistance Program ("CAP"). This is the school's equivalent of an employee assistance program.  Such programs commonly offer free and

confidential assessments, short-term counseling, referrals to healthcare professionals, and follow-up services to employees with personal or work-related problems.

34.     To save his career in that medical subspecialty, Plaintiff complied.  Unexpectedly, as a result, he incurred thousands of dollars in unnecessary evaluation and treatment costs; thousands of dollars in legal fees; universal disregard for his privacy rights; hundreds of hours spent attempting to remedy the entire matter; intolerable training conditions causing him to leave the fellowship; and now a permanent stain on his professional records that will forever interfere with his ability to practice medicine and impose an unnecessary but ongoing financial burden.

35.     All of this unfolded very quickly.  The CAP counselor required Plaintiff to take drug tests, which were negative, and undergo a mental health examination by a psychiatrist contracted for that purpose by LSU ("LSU psychiatrist").  It is unclear whether the CAP counselor instructed the LSU psychiatrist to conduct a broad and comprehensive mental health evaluation, or a narrow occupational ("fit-for-duty") examination.

36.     The LSU psychiatrist examined Plaintiff over the course of at least four one-hour sessions, and conducted a comprehensive evaluation far beyond the scope relevant to his fitness to train in a fellowship program.  Nonetheless, the LSU psychiatrist ultimately said he was "unable to decide" whether Plaintiff was fit for duty.

37.     Although the LSU psychiatrist did not perform his assigned task, he gratuitously addressed other subjects to Plaintiff's detriment.  Among other things, he told LSU that his "preliminary diagnosis" was that Plaintiff had a completely irrelevant "personality disorder"; that Plaintiff would require an even more extensive, three-day inpatient psychological examination; and that to be properly monitored and treated in the future, Plaintiff would need to register with HPFL and follow its instructions.

38.     Plaintiff again complied, following HPFL's directives.  HPFL assigned him a "case manager." Plaintiff met with the case manager and others at HPFL, who directed him to report to one of three specifically-named mental health treatment centers for a three-day comprehensive psychological examination at Plaintiff's own expense.

39.     Plaintiff made an appointment to do so at the facility with an immediate opening, which was PRC in Lawrence, Kansas.  HPFL also required Plaintiff to consent to PRC disclosing any and all resulting information to HPFL directly, and waiving all legal protection of it.

40.     During the period of July 23, 2019 through July 25, 2019, Plaintiff was an inpatient at PRC and was subjected to the comprehensive examination ordered by HPFL.  He paid for it himself, at a cost of $6,500.  By the time of this inpatient stay, Plaintiff had been forced to resign from his fellowship position at LSU in order to evade that coercive force.

41.     However, a new coercive force arose in the form of the Board.  HPFL told Dr. Duhon if he failed to comply with the mandated examination by PRC and HPFL's other directives, it would report him to the Board and he would lose the physician license he wanted to retain from that board. Plaintiff knew that HPFL was very influential with the Board, given its position as the destination for Board referrals involving actual or suspected mental health issues.

42.     PRC eventually issued its report to HPFL and Plaintiff.  Despite the magnitude of its implications to Plaintiff, and the significance that would be placed on it by HPFL, and potentially by the Board as a group of licensed physicians themselves, the report listed only one psychiatrist as an author and he or she was "not available for signature."

43.     The report's "diagnostic formulation" for Plaintiff was a confused mix of historical information (including his resignation from the fellowship program); supposed conditions "in sustained remission"; general categories of purported "personality traits"; several "other,"

"unspecified" and "possible" issues; and "self-reported" matters.  Nonetheless, PRC prescribed a 90-day inpatient stay at PRC for "treatment."

44.     Nothing in the PRC report explained how this diagnoses and the treatment plan was within the scope of PRC's assignment from HPFL, or within the scope of HPFL's original interest as received from LSU, which was Plaintiff's fitness to train as a fellow.  Nor was it within the scope of HPFL's self-determined modification of that interest, which was Plaintiff's fitness to have a medical license generally.

45.     Plaintiff objected to PRC's diagnoses and treatment plan, and objected more broadly to HPFL's continued involvement in his affairs for no legitimate reason.  HPFL admitted PRC's report was incorrect, even fraudulent, and ordered Plaintiff to report for a new evaluation at TRC in Baton Rouge, Louisiana.  TRC is primarily an outpatient substance abuse treatment facility, yet there had been no event or test result suggesting substance abuse by Plaintiff.

46.     At this time, Plaintiff hired two well-respected Louisiana psychiatrists to conduct fit-for-duty examinations and report to HPFL.  Both of these experts identified numerous flaws and inaccuracies in the PRC report, and both expressed full confidence that Plaintiff was indeed fit to practice medicine.

47.     One of these experts was a faculty member at LSU itself—a Clinical Assistant Professor of the LSU Department of Psychiatry.  The other was a faculty member at Tulane University—the Chair and Professor of Psychiatry & Behavioral Sciences.

48.     Unpersuaded by Plaintiff's objections and two favorable fit-for-duty reports, HPFL reported him to the Board (which had never before been involved) making the false statement that Plaintiff had a potential substance abuse problem and/or mental health condition that impaired his ability to practice medicine.  It also reported that he was non-compliant with HPFL's directives

and with the PRC treatment plan, ignoring that HPFL had already rejected the PRC plan as improper.

49.     On October 4, 2019, the Board notified Plaintiff he was under investigation for "possible violations of the [Louisiana] Medical Practice Act" because he "was noncompliant with [HPFL's] recommendations as well as the recommendations from his PRC evaluation." The Board stated that "the easiest way to resolve this case would be through the full cooperation of Plaintiff with the recommendations of the HPFL and PRC."

50.     The Board did not identify any adverse event, act, or omission by Plaintiff that might have constituted a violation of the Medical Practice Act, nor did it explain why "non-compliance" with HPFL or PRC mandates, standing alone, should affect Plaintiff's medical license.

51.     Still trying to satisfy HPFL, Plaintiff met with TRC in Baton Rouge on December 4, 2019 and explained that he had already been cleared by two top psychiatrists at Louisiana's leading institutions. At that meeting, TRC refused to review, discuss or accept copies of the reports by the two psychiatrists, insisting instead it needed to conduct its own evaluation and generate (and charge Plaintiff for) TRC's own treatment and monitoring plan.

52.     This was the final straw for Plaintiff, and he declined to participate further with TRC. Instead, his attorneys wrote HPFL on February 20, 2020 to reiterate that two leading experts had found him fit for duty, and to demand that HPFL close Plaintiff's file and advise the Board there is no basis for further review or action against his current license.

53.     Neither HPFL nor the Board responded to this letter, and the Board subsequently stated it was never passed along to the Board from HPFL. The Board contacted Plaintiff in June and July 2020, following up on his matter. After discussions with Plaintiff's attorneys, the Board

still insisted that Plaintiff's license was subject to immediate suspension at any time and that to avoid this he must have yet another evaluation done. The Board gave Plaintiff his choice of four facilities, none of which were located in Louisiana. One of those four was PRC. The others have a similar reputation for over-diagnosing and over-treating physicians referred coercively by their state medical boards, employers, or others with career-ending leverage to force the physicians' cooperation.

54.     Additionally, the effect of Defendants' misconduct has gone beyond Louisiana alone. In September 2019, Plaintiff had applied for physician's license from the Mississippi State Board of Medical Licensure. It notified him on March 12, 2020 that it was suspending its processing of his application until he reported to HPFL's counterpart in that state, namely the Mississippi Physician Health Program ("MPHP").  Upon information and belief, this was the result of a defamatory false report to the Mississippi board by the Board and/or by HPFL based on the false record of disability created by Defendants.

55.     As alleged above, no evidence existed, or was later discovered, to support the referral of Plaintiff from Dr. Jain to LSU's assistance program; or from that program to the LSU psychiatrist; or from him to HPFL; or from HPFL to PRC (and later TRC); or from HPFL to the Board.

## DAMAGES

56.     As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer significant damages in the form of unnecessary out-of-pocket expenses, lost income, and more.

57.     As a result of Defendants' conduct, Plaintiff has also been harmed by inability to complete his fellowship training and become board-certified in his chosen subspecialty of cardiology; his employment prospects are lower and his earning capacity is significantly

diminished; and he suffered great emotional distress.

58.     Accordingly, Plaintiff seeks the following compensatory damages:

- Decreased earning capacity;

- Expenses and costs associated with all of the improper evaluations required by Defendants, and the evaluations Plaintiff was forced to commission himself in rebuttal;

- Legal costs;

- Invasion of privacy;

- Damaged reputation;

- Emotional distress, mental anguish, and humiliation.

59.     Plaintiff also demands reinstatement into LSU's Cardiology Fellowship.

60.     In addition, Plaintiff demands an award of punitive damages under all state law tort claims supporting such damages and liquidated damages under the ADA.

61.     Due to the ongoing discrimination he has encountered, Plaintiff reasonably anticipates that he will continue to experience discrimination until an Order is entered by the Court mandating that Defendants cease their discrimination against Plaintiff and take all necessary steps to expunge or seal his records and otherwise remedy the discrimination that has already occurred.

62.     Unless or until this Court issues an Order in Plaintiff's favor, he has no reason to believe that Defendants will cease discriminating against him in violation of federal civil rights laws.

63.     Plaintiff remains eligible, and desires, to re-enroll at the LSU fellowship program to complete his board eligibility training.

64.     Unless or until this Court issues an Order in his favor, Plaintiff is deterred from

attempting to re-enroll at LSU as he knows it would be a futile gesture.

65.     Moreover, Plaintiff requests that Defendants LSU and Thomas C. Galligan, Jr. be Ordered to provide LSU staff with requisite training on the requirements of due process, the ADA, RA, and ACA and non-discrimination against individuals with disabilities or regarded as having such.

## COUNT I: DISABILITY DISCRIMINATION IN EMPLOYMENT VIOLATING TITLE I OF THE AMERICANS WITH DISABILITIES ACT

66.     Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 65 above as the allegations of paragraph 66, as if set forth in full herein.

67.     Plaintiff asserts this claim against Defendant LSU.

68.     At all times relevant to this action, Title I of the ADA, 42 U.S.C. § 12111, *et seq*. has been in full force and effect and has applied to this Defendant's conduct.

69.     At all times relevant to this action, the United States Department of Labor regulations implementing Title I of the ADA, 29 C.F.R. Part 1630, have been in full force and effect and have applied to this Defendant's conduct.

70.     At all times relevant to this action, Plaintiff was *regarded* by this Defendant as having an impairment as described and defined in the ADA, 42 U.S.C. § 12102(1)(C) and (3). Also, LSU created a record of such impairment within the meaning of to 42 U.S.C. § 12102(1)(B).

71.     LSU is an employer within the meaning of Title I of the ADA, 42 U.S.C. § 12111(5).

72.     Title I of the ADA provides that "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

14

73.     Federal regulations implementing Title I of the ADA clarify and impose specific obligations on covered entities. 29 C.F.R. § 1630, *et seq.*

74.     By and through their actions set forth above, LSU discriminated against Plaintiff, on the basis of his perceived disability and false record of disability, in violation of Title I of the ADA and its implementing regulations by harassing him and forcing his constructive discharge.

75.     As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.      Order Defendants to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.      Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.      Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.      Liquidated damages in an amount to be determined at trial or in summary proceedings;

E.      An award of Plaintiff's reasonable attorneys' fees and costs; and

F.      Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT II: DISABILITY DISCRIMINATION IN PUBLIC SERVICES
## VIOLATING TITLE II OF THE AMERICANS WITH DISABILITIES ACT

76.     Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 75 above as the allegations of paragraph 76, as if set forth in full herein.

77.     Plaintiff asserts this claim against Defendants LSU, the Board, HPFL and PRC.

78.     At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, *et seq*. has been in full force and effect and has applied to these Defendants' conduct.

79.     At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to these Defendants' conduct.

80.     At all times relevant to this action, Plaintiff was *regarded* by this Defendant as having an impairment as described and defined in the ADA, 42 U.S.C. § 12102(1)(C) and (3). Also, LSU created a record of such impairment within the meaning of to 42 U.S.C. § 12102(1)(B).

81.     LSU and the Board are public entities within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1). HPFL and PRC were agents of these public entities and otherwise "state actors" within the scope of liability under Title II of the ADA.

82.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

83.     Federal regulations implementing Title II of the ADA provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity

to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

84.     Federal regulations implementing Title II of the ADA further provide that "a public entity shall operate each service, program, or activity so that the service, program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

85.     Federal regulations implementing Title II of the ADA further provide that a public entity "may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part." 28 C.F.R. § 35.130(b)(6).

86.     Federal regulations implementing Title II of the ADA further provide that a public entity "may not, directly or through contractual or other arrangements, utilize criteria or methods of administration— (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3).

87.     Federal regulations implementing Title II of the ADA further provide that a public entity may not "Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(vii).

88.     Federal regulations implementing Title II of the ADA further provide that a public entity "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

89.     The Department of Justice Title II Technical Assistance Manual section 3.5300 prohibits mental health evaluations that are not narrowly focused on the reason for requiring it, i.e. "unnecessary inquiries into the existence of a disability."

90.     By and through their actions set forth above, LSU and the Board discriminated against Plaintiff, on the basis of his perceived disability, in violation of Title II of the ADA and its implementing regulations by harassing him and forcing his constructive discharge.

91.     As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.      Order Defendants to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.      Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.     Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.     Liquidated damages in an amount to be determined at trial or in summary proceedings;

E.     An award of Plaintiff's reasonable attorneys' fees and costs; and

F.     Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

### COUNT III: DISABILITY DISCRIMINATION IN PUBLIC ACCOMMODATIONS VIOLATING TITLE III OF THE AMERICANS WITH DISABILITIES ACT

92.     Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 91 above as the allegations of paragraph 92, as if set forth in full herein.

93.     Plaintiff asserts this claim against Defendants HPFL and PRC.

94.     At all times relevant to this action, Title III of the ADA, 42 U.S.C. § 12181, *et seq.* has been in full force and effect and has applied to these Defendants' conduct.

95.     At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, have been in full force and effect and have applied to these Defendants' conduct.

96.     At all times relevant to this action, Plaintiff was regarded by this Defendant as having an impairment as described and defined in the ADA, 42 U.S.C. § 12102(1)(C) and (3). Also, LSU created a record of such impairment within the meaning of to 42 U.S.C. § 12102(1)(B).

97.     HPFL and PRC are health care providers, or other service establishments, and as such are public accommodations within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(F).

98.     Title III of the ADA provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

99.     Among other things, Federal regulations implementing Title III of the ADA provide that a private entity may not discriminate against individuals on the basis of disability with respect to providing opportunities to participate, or to screen them from such opportunities. 42 U.S.C. § 12182(a); (b)(1)(A)(i); (b)(1)(C); (b)(2)(A)(1).

100.    By and through their actions as *de facto* gatekeepers to Plaintiff's fellowship position and his physician's license, set forth above, HPFL and PRC discriminated against Plaintiff in his opportunities, on the basis of his perceived disability, in violation of Title III of the ADA and its implementing regulations by harassing him and forcing his constructive discharge.

101.    As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.      Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

B.      Compensatory damages for economic and non-economic injuries in an amount to

be determined at trial;

C.      Liquidated damages in an amount to be determined at trial or in summary

proceedings;

D.      An award of Plaintiff's reasonable attorneys' fees and costs; and

E.      Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT IV: DISABILITY DISCRIMINATION BY A FEDERALLY FUNDED PROGRAM VIOLATING SECTION 504 OF THE REHABILITATION ACT

102.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1

through 101 above as the allegations of paragraph 102, as if set forth in full herein.

103.    Plaintiff brings this claim against Defendant LSU based upon the Rehabilitation

Act, 29 U.S.C. § 794, et seq.

104.    The Rehabilitation Act provides that "no otherwise qualified individual with a

disability in the United States…shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any program

or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

105.    This obligation of non-discrimination extends to "all of the operations…of a

college, university, or other postsecondary institution, or a public system of higher education." 29

U.S.C. § 794(b)(2)(A).

106.    As set forth herein, LSU violated the Rehabilitation Act by intentionally

discriminating against Plaintiff, solely by reason of his disability.

107.    For the same reasons LSU violated the ADA, it violated the Rehabilitation Act.

108.     LSU is the recipient of hundreds of millions of dollars annually in federal funds, including student loans, grants and contracts.

109.     As the recipient of federal funds, LSU is liable for damages to Plaintiff as a result of its acts and omissions constituting intentional discrimination.

110.     As set forth above, Plaintiff has been denied access to the services, programs, facilities, activities and accommodations offered by LSU solely by reason of his perceived disability and erroneous record of a disability, and has otherwise been discriminated against and damaged solely by reason of his disability as a result of Defendants' Rehabilitation Act violations set forth above.

111.     Plaintiff has been obligated to retain undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to recover his attorneys' fees, costs and litigation expenses from Defendants pursuant to 29 U.S.C. §794(b).

112.     As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.     Order Defendants to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.     Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that

Plaintiff's training period exceeded the normal period because he had been

improperly dismissed before being reinstated for completion of his training;

C.      Compensatory damages for economic and non-economic injuries in an amount to

be determined at trial;

D.      Liquidated damages in an amount to be determined at trial or in summary

proceedings;

E.      An award of Plaintiff's reasonable attorneys' fees and costs; and

F.      Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT V: DISABILITY DISCRIMINATION
## VIOLATING SECTION 1557 OF THE
## PATIENT PROTECTION AND AFFORDABLE CARE ACT

113.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1

through 112 above as the allegations of paragraph 113, as if set forth in full herein.

114.    Plaintiff asserts this claim against Defendant LSU.

115.    At all times relevant to this action, Section 1557 of the Patient Protection and

Affordable Care Act ("Section 1557"), 42 USC § 18116 was in full force and effect and applied

to LSU's conduct.

116.    At all times relevant to this action, Section 1557, 42 USC § 18116, incorporated

the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

117.    For the reasons set forth above, at all relevant times Plaintiff was an individual with

a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and of Section 1557,

42 USC § 18116.

118.    At all times relevant to this action, LSU received federal financial assistance,

including Medicare payments, and were engaged in the provision of health care. Therefore, LSU was operating health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

119.    Pursuant to Section 1557, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

120.    For the reasons fully set forth above, LSU subjected Plaintiff to discrimination, solely on the basis of disability, in violation of Section 1557, 42 U.S.C. § 18116 by harassing him and forcing his constructive discharge.

121.    LSU discriminated against Plaintiff by forcing him out of its fellowship training program and falsely labeling him as an impaired physician with a mental health issue.

122.    Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss he sustained as a result of LSU's discriminatory conduct as hereinbefore alleged.

123.    Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a), the Rehabilitation Act, 29 U.S.C. § 794(a).

124.    As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.    Order Defendants to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.      Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.      Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.      Punitive damages in an amount to be determined at trial;

E.      An award of Plaintiff's reasonable attorneys' fees and costs; and

F.      Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT VI: VIOLATIONS OF FOURTEENTH
## AMENDMENT PROCEDURAL DUE PROCESS RIGHTS

125.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 124 above as the allegations of paragraph 125, as if set forth in full herein.

126.    Plaintiff asserts this claim against Defendants LSU and the Board, which are a public university and a state licensing authority, and therefore instrumentalities of the State of Louisiana within the meaning of the 14th Amendment of the United States Constitution.

127.    The Fourteenth Amendment states, in relevant part, "…nor shall any State deprive any person of life, liberty, or property, without due process of law…".

128.    Plaintiff had a protected property interest in continuing his fellowship training in the LSU program. He also had protected liberty interests in practicing medicine under his Board-issued physician's license, and in pursuing his chosen profession of a board-certified subspecialist

physician.

129.    In the manners alleged above, LSU and the Board deprived Plaintiff of these protected interests.

130.    LSU and the Board did not afford Plaintiff adequate pre-deprivation procedural rights. Among other things, LSU did not afford Plaintiff such rights in forcing him to submit to HPFL for processing as an allegedly impaired physician. Additionally, the Board did not afford Plaintiff such rights in forcing him to respond to HPFL and to the Board as an allegedly impaired physician.

131.    As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.    Order Defendants to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.    Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.    Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.    Punitive damages in an amount to be determined at trial;

E.      An award of Plaintiff's reasonable attorneys' fees and costs; and

F.      Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

**COUNT VII: SECTION 1983**
**DEPRIVATION OF DUE PROCESS RIGHTS - CONSPIRACY**

132.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 131 above as the allegations of paragraph 132, as if set forth in full herein.

133.    Plaintiff asserts this claim against Defendants Dr. Jain, HPFL, and PRC.

134.    All Defendants, including Dr. Jain, HPFL, and PRC, conspired with each other within the meaning of 42 U.S.C. § 1985 ("Section 1985").

135.    The purpose of Defendants' conspiracy was to deprive Plaintiff of his constitutional rights to procedural due process.

136.    As alleged in detail above, one or more Defendants committed acts in furtherance of this conspiracy.

137.    Defendants' conspiracy caused Plaintiff to be deprived of his procedural due process rights.

138.    As a proximate result of Defendants' conduct Plaintiff was as alleged above in paragraph 57.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.      Order Defendants to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.      Injunctive relief ordering Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any

27

impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.      Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.      Punitive damages in an amount to be determined at trial;

E.      An award of Plaintiff's reasonable attorneys' fees and costs; and

F.      Such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## **COUNT VIII: NEGLIGENCE**

139.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 138 above as the allegations of paragraph 139, as if set forth in full herein.

140.    Plaintiff asserts this claim against Defendants HPFL and PRC.

141.    HPFL and PRC, as Plaintiff's healthcare providers, owed him a duty of care.

142.    HPFL and PRC breached their duty of care in the manners alleged in detail above, by, *inter alia*, failing to accurately evaluate Plaintiff's condition and promptly conclude he had no substance abuse issue, no impairment, and no other mental health problem that made him unfit for duty in his fellowship position.

143.    As a proximate result of the negligence of the Defendants, Plaintiff has suffered the loss of his chosen subspecialty, has lost income and earning capacity, has suffered pecuniary damages and out of pocket costs, and has suffered emotional distress.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against

Defendants:

A.    Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

B.    An award of Plaintiff's costs of this suit; and

C.    Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT IX: FRAUD

144.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 138 above as the allegations of paragraph 144, as if set forth in full herein.

145.    Plaintiff asserts this claim against Defendants HPFL and PRC.

146.    HPFL and PRC falsely represented that their services and results were legitimate and truthful and that Plaintiff needed them.

147.    These representations were material to Plaintiff's decision to comply with orders to submit to evaluations and other services from HPFL and PRC.

148.    Plaintiff justifiably relied on those representations, which were false in the manners alleged in detail above.

149.    As a proximate result of the fraud committed by the Defendants, Plaintiff has suffered the loss of his chosen subspecialty, has lost income and earning capacity, has suffered pecuniary damages and out of pocket costs, and has suffered emotional distress.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.    Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

29

B.      An award of Plaintiff's costs of this suit; and

C.      Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT X: DEFAMATION

150.    Plaintiff adopts and incorporates by reference the allegations of paragraph 1 through 138 and 144 through 149 above as the allegations of paragraph 150, as if set forth in full herein.

151.    Plaintiff asserts this claim against Defendants Dr. Jain, HPFL and PRC. Each of these Defendants made false statements about Plaintiff.

152.    Among other things, Dr. Jain falsely represented to HPFL and PRC, verbally and/or through documentation, that Plaintiff had exhibited behavior suggesting mental instability; that he constituted a threat to patients, co-workers and/or himself; that he was unfit for duty as a medical fellow; that he was a substance abuser, and that he required a psychological evaluation.

153.    Similarly, and among other things, HPFL falsely represented to LSU, PRC and the Board, verbally and/or through documentation, that Plaintiff had exhibited behavior suggesting mental instability; that he constituted a threat to patients, co-workers and/or himself; that he was unfit for duty as a medical fellow; that he was a substance abuser, and that he required a psychological evaluation, treatment and monitoring.

154.    Similarly, among other things, PRC falsely represented to HPFL and the Board, verbally and/or through documentation, that Plaintiff had exhibited behavior suggesting mental instability; that he constituted a threat to patients, co-workers and/or himself; that he was unfit for duty as a medical fellow; that he was a substance abuser, and that he required a psychological evaluation, treatment and monitoring.

155.    All of these false statements by each of these Defendants was made intentionally, knowingly, and/or with a level of intent sufficient to make them culpable.

156.    As a proximate result of the defamation committed by the Defendants, Plaintiff has suffered the loss of his chosen subspecialty, has lost income and earning capacity, has suffered pecuniary damages and out of pocket costs, and has suffered emotional distress.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.    Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

B.    An award of Plaintiff's costs of this suit; and

C.    Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

Dated: July 15, 2020.

/s/ Kerry Murphy
Kerry Murphy (La. Bar. No. 31382)
kmurphy@laskymurphy.com
Katie Lasky (La. Bar No. 28652)
klasky@laskymurphy.com
Lasky Murphy LLC
715 Girod Street, Suite 250
New Orleans, Louisiana 70130
(504) 603-1500

and

Edward R. Moor, T.A. (IL Bar No. 6205169)
Moor Law Office, P.C.
One N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 726-6207
erm@moorlaw.net
*Motion for Pro Hac Vice Admission Forthcoming*

and

Jeffrey Weisman (IL Bar No. 6295539; DC Bar No.
    986696)
Marek Weisman LLC
55 E Monroe Street, Suite 3800
Chicago, Illinois 60603
(312) 470-7662
jweisman@marekweisman.com
*Motion for Pro Hac Vice Admission Forthcoming*

***Attorneys for Plaintiff***

**<u>PLEASE WITHHOLD SERVICE.</u>**