## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

-------------------------------------------------------

**GREGORY J. DUHON, M.D.,**

      **Plaintiff,**

      **v.**

**THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, LOUISIANA STATE BOARD OF MEDICAL EXAMINERS, HEALTHCARE PROFESSIONALS FOUNDATION OF LOUISIANA, PROFESSIONAL RENEWAL CENTER, P.A., NEERAJ JAIN, M.D., MARGARET BISHOP-BAIER, M.D., ERIK A. WHITFIELD, M.D., JAMES DAVID HAMMOND, M.D., BETSY WHITE WILLIAMS, M.D., and LAWRENCE H. CRESSWELL, M.D.,**

      **Defendants.**

-------------------------------------------------------

**CASE NO. 20-cv-2022-KTM-KWR**

**JUDGE MILAZZO**

**MAGISTRATE JUDGE ROBY**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Plaintiff, Gregory J. Duhon, M.D., through undersigned counsel, brings this Complaint and Demand for Jury Trial against Defendants Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU"); Louisiana State Board Of Medical Examiners ("LSBME"); Healthcare Professionals Foundation Of Louisiana ("HPFL"); Professional Renewal Center, P.A. ("PRC"); Neeraj Jain, M.D.; Margaret Bishop-Baier, M.D.; Erik A. Whitfield, M.D.; James David Hammond, M.D.; Betsy White Williams, M.D.; and Lawrence H. Cresswell, M.D, and states ss follows:

## PRELIMINARY STATEMENT

1.      Plaintiff's supervisor in the LSU cardiology fellowship program accused him of being "impaired in the workplace" on May 23, 2019. He was immediately tested for drugs and alcohol with a negative result. Plaintiff had been clean and sober since 2011. Neither the supervisor nor anyone else had any contrary evidence. Plaintiff later obtained fit-for-duty evaluations from two leading clinical psychiatrists in Louisiana, one at Tulane and one at LSU.

2.      In many professions, that would have been more than enough to end the matter. *See, e.g.,* RS 37:1063.1 (Optometry board imposes a minimum threshold of specific evidence necessary to warrant a psychological evaluation, which if justified will be conducted by a physician specializing in addiction and narrowly tailored to the issue of impairment). *See also*, RS 37:1217 (Pharmacy board follows the identical process).

3.      However, LSBME and LSU have no such system and mishandled the situation so badly that Plaintiff lost his fellowship position; left the state due to licensing problems; was denied a license in Mississippi; is unable to transfer into any other fellowship program to complete his training; and watched helplessly as the career he had hoped for and invested in was destroyed.

4.      Plaintiff's permanent records at LSU and LSBME are now so tainted with false and disparaging entries that he has no choice but to bring this action to have <u>any</u> future in medicine, even ineligible for board certification. Plaintiff's primary goal is injunctive relief to purge his records of such material, with the supplemental goal of recovering his financial losses.

5.      To that end, he now asserts claims against the persons and entities responsible, particularly the physicians, for violations of his Constitutional right to procedural and substantive Due Process (Counts 1-3); his rights under the Rehab Act and Americans with Disabilities Act ("ADA") (Counts 4-5); and his rights under Louisiana tort law (Counts 6-7).

## PARTIES

6.      Plaintiff GREGORY DUHON, M.D. is a citizen of the United States; was a resident of Metairie, Louisiana at the time this case was filed originally; and was a physician licensed to practice medicine in the State of Louisiana by LSMBE.

7.      Defendant THE BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE, d/b/a Louisiana State University School of Medicine ("LSU"), is a Louisiana political subdivision. It is the recipient of hundreds of millions of dollars annually in federal funds.

8.      Defendant LOUISIANA STATE BOARD OF MEDICAL EXAMINERS ("LSBME") is a Louisiana political subdivision. It issues the licenses needed by physicians to practice medicine in the State of Louisiana.

9.      Defendant HEALTHCARE PROFESSIONALS FOUNDATION OF LOUISIANA ("HPFL") is a private not-for-profit corporation organized under the laws of the State of Louisiana. HPFL was originated by LSBME to oversee the evaluation, treatment, and monitoring of impaired or potentially impaired physicians.

10.     Defendant PROFESSIONAL RENEWAL CENTER, P.A. ("PRC") is a private professional association organized under the laws of the State of Kansas. It is a recipient of federal funds.

11.     Defendant NEERAJ JAIN, M.D. ("Jain") is the Program Director of LSU's cardiology fellowship program. He has capacity to effectuate injunctive relief ordered against LSU, including reinstatement of Plaintiff to complete his fellowship training and purging Plaintiff's training records of discriminatory and defamatory material. Jain is sued in his private and official capacities pursuant to the doctrine of *Ex parte Young*.

12.     Defendant MARGARET BISHOP-BAIER, M.D. ("Bishop-Baier") is the Medical Director of LSU's CAP. She has capacity to effectuate injunctive relief ordered against LSU, including purging Plaintiff's training records of discriminatory and defamatory material. Bishop-Baier is sued in her private and official capacities pursuant to the doctrine of *Ex parte Young*.

13.     Defendant ERIK A. WHITFIELD, M.D. ("Whitfield") is a psychiatrist who conducts forensic psychological evaluations for LSU to determine fitness-for-duty. He has capacity to effectuate injunctive relief ordered against LSU, including purging Plaintiff's training records of discriminatory and defamatory material. Whitfield is sued in his private and official capacities pursuant to the doctrine of *Ex parte Young*.

14.     Defendant JAMES DAVID HAMMOND, M.D. ("Hammond") is the Medical Director of HPFL. He has capacity to effectuate injunctive relief ordered against HPFL, including purging Plaintiff's monitoring records of discriminatory and defamatory material. Hammond is sued in his private and official capacities pursuant to the doctrine of *Ex parte Young*.

15.     Defendant BETSY WHITE WILLIAMS, PhD. ("Williams") is the Clinical Director of PRC. She has capacity to effectuate injunctive relief ordered against PRC, including purging Plaintiff's healthcare records of discriminatory and defamatory material. Williams is sued in her private and official capacities pursuant to the doctrine of *Ex parte Young*.

16.     Defendant LAWRENCE H. CRESSWELL, D.O. ("Cresswell") is the Director of Investigations at LSBME. He has capacity to effectuate injunctive relief ordered against LSBME, including purging Plaintiff's licensing records of discriminatory and defamatory material. Cresswell is sued in his private and official capacities pursuant to the doctrine of *Ex parte Young*.

**JURISDICTION & VENUE**

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law. It has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside here, and/or a substantial part of the events giving rise to the claims occurred here, and/or discriminatory acts were committed here.

**STATEMENT OF FACTS**

19.     Plaintiff entered into a contract with LSU to participate in the cardiology fellowship program during the July 2018 to June 2019 academic year. That contract incorporated by reference the LSU House Officer Manual ("HOM"). As reflected in the terms of the contract and HOM, both Plaintiff and LSU expected annual renewals of the agreement during the three-year training period unless either party took steps to invoke the non-renewal or termination provisions.

20.     Plaintiff has a disability as that term is defined for purposes of claims asserted herein. He has substance use disorder ("SUD") that was treated in 2011 and has remained in remission continuously since then; he has a record of that disability, which was added to falsely through Defendants' misconduct; and he was regarded by each and every Defendant as having that disability. 42 U.S.C. § 12102.

21.     On May 23, 2019, Jain advised Plaintiff that he was being suspended effective immediately on suspicion of being mentally impaired. Jain did not explain what he meant by that, nor did he cite any supporting evidence. He simply told Plaintiff that he would not be allowed to resume his duties unless and until he obtained fit-for-duty clearance from CAP.

22.     Jain did not follow the terms of Plaintiff's contract in suspending him. The contract

stated the "Program Director…shall have the authority to summarily suspend, without prior notice, all or any portion of [Plaintiff's] appointment and/or privileges, whenever it is in good faith determined that the continued appointment of [Plaintiff] places the safety or health of patients or University personnel in jeopardy or to prevent imminent disruption of University operation." Plaintiff was not aware of any circumstances that fit the description of this provision, and Jain did not advise him of any. Nothing indicated to Plaintiff that his suspension was being effected "in good faith."

23.     Additionally, Jain did not follow the terms of Plaintiff's contract in referring him immediately to CAP. The contract stated "a House Officer who is reasonably believed to be impaired or potentially impaired, but refuses to avail him/herself of assistance shall be reported to the Campus Assistance Program and/or [HPFL] for evaluation." Plaintiff did not "refuse" anything, and Jain did not offer any "assistance" or describe what that might be. Once again, nothing indicated to Plaintiff that his immediate referral to CAP was being done in good faith.

24.     Plaintiff's contract permitted the formal appeal of "termination, non-promotion, and non-renewal," but not suspension. The HOM, however, stated that LSU would provide Plaintiff with written reasons within two (2) days of any suspension, and that he then had five (5) days to respond in writing. Neither Jain nor anyone else at LSU ever provided Plaintiff with the written reasons for suspension as promised.

25.     Plaintiff followed Jain's instructions and went to CAP to request fit-for-duty clearance. Scott Embley, the Assistant Director of CAP and person in charge of drug-testing, conducted an immediate urinalysis test with negative results. The Medical Director of CAP, Defendant Bishop-Baier, M.D., permitted Embley to serve in this disciplinary role with respect to Plaintiff, even though Embley had been Plaintiff's therapist in a few counseling sessions sought

by Plaintiff on an unrelated matter in early 2019.

26.     Among other things, Plaintiff had disclosed to Embley during counseling that he had been treated for substance use disorder ("SUD") in 2011 and remained sober continuously since then. Ignoring ethical rules as well as Plaintiff's contract with LSU, which said any clinical counseling with CAP would be "confidential," Embley merged his sources of data and, Plaintiff was later told, became fixated on the idea that Plaintiff had relapsed but was concealing it. Both Bishop-Baier and Embley have pursued this matter as if that is their belief.

27.     Conflating Plaintiff's earlier clinical records with his later disciplinary records is inconsistent with the tight control exercised by federal law over this particular disability. 42 U.S.C. § 290dd-2(a)-(d). That law also strictly prohibits discrimination against Plaintiff on the basis of that specific disability. *Id*., § 290dd-2(e). The law is aimed at institutions of higher learning in particular, and is intended to "increase access to, and reduce the stigma associated with, mental health services to ensure that students at institutions of higher education have the support necessary to successfully complete their studies." *Id.,* § 290ee-4.

28.     Bishop-Baier had no apparent policies or procedures for gathering evidence and making an informed decision about whether to compel an OMPE. Plaintiff's drug test had been negative. Plaintiff's latest academic evaluation listed certain issues and observations, but when cross-referenced with HPFL's list of 25 SUD indicators there was a match to only two: sporadic unavailability for texting or paging and minimal absenteeism. None of the more reliable indicators were reflected in the evaluation, for example alcohol on Plaintiff's breath; or unusual behavior; or colleagues witnessing drug use or drinking.

29.     In any event, CAP instructed Plaintiff to submit to an OMPE by Defendant Whitfield, M.D. Whitfield met with Plaintiff four (4) times in one-hour sessions. The subject

matter of these interviews was boundless, even though Bishop-Baier and Whitfield knew, or should have known, that the professional standards for OMPEs, rooted in the ADA and other examinee protections, required Whitfield to remain narrowly focused on the "referral questions" and "essential job functions" for which Plaintiff's fitness was being assessed. American Psychological Association Guidelines for Occupationally Mandated Psychological Evaluations ("APA Guidelines"), nos. 2, 3.

30.    Equally boundless was the broad and invasive scope of information documented by Whitfield and conveyed in his report to LSU. His disclosures went far beyond anything relevant to Jain's allegation that Plaintiff was impaired at work. Whitfield sent, and Bishop-Baier welcomed, a report filled with Plaintiff's "developmental and family history, emotional and interpersonal functioning, history of compliance with social and occupational roles… and other private domains of life" that was not proper to disclose. APA Guideline 11.

31.    Whitfield's report said he was "unable to decide" whether Plaintiff was fit for duty. Embley had told Whitfield his theory that Plaintiff had relapsed. Even though Whitfield did not fulfill the goal of his referral, he gratuitously addressed other subjects to Plaintiff's detriment. Among other things, he told CAP his "preliminary diagnosis" was that Plaintiff had a completely irrelevant "personality disorder"; that Plaintiff would require an even more extensive, three-day OMPE; and that to be properly monitored and treated in the future, Plaintiff would need to register with HPFL and follow its instructions for treatment and monitoring (even though no need had been identified). HPFL was created to receive physician referrals from LSBME, coordinate evaluations and treatment, and provide long-term monitoring.

32.    After receiving Whitfield's report, CAP and Baier-Bishop instructed Plaintiff to report to HPFL. Plaintiff again complied. HPFL assigned him a "case manager." Plaintiff met with

the case manager and others at HPFL, who directed him—with no supporting justification—to report to one of three specifically named mental health treatment centers for a three-day comprehensive psychological examination at Plaintiff's own expense. HPFL denied Plaintiff's request to obtain the examination from any of the thousands of qualified and licensed psychiatrists or forensic psychologists in Louisiana.

33.     Plaintiff made an appointment for this second OPME at the facility with an immediate opening, which was Professional Renewal Center in Lawrence, Kansas.  HPFL also required Plaintiff to consent to PRC disclosing any and all resulting information to HPFL directly and waiving all legal protection of it.

34.     During the period of July 23, 2019 through July 25, 2019, Plaintiff was an inpatient at PRC and was subjected to the comprehensive examination ordered by HPFL.  He paid for it himself, at a cost of $6,500.  By the time of this inpatient stay, Plaintiff had been forced to resign from his fellowship position at LSU in order to evade that coercive force.

35.     However, a new coercive force arose in the form of LSBME.  HPFL told Dr. Duhon if he failed to comply with the mandated examination by PRC and HPFL's other directives, it would report him to LSBME, and he would lose the physician license he wanted to retain from that board. Plaintiff knew that HPFL was very influential with LSBME, given its position as the destination for LSBME referrals involving actual or suspected mental health issues.

36.     PRC eventually issued its report to HPFL and Plaintiff.  Despite the magnitude of its implications to Plaintiff, and the significance that would be placed on it by HPFL, and potentially by LSBME as a group of licensed physicians themselves, the report listed only one psychiatrist as an author and he or she was "not available for signature."

37.     PRC   conducted   a   sham   evaluation   that   resulted   in   a   meandering   and

incomprehensible "diagnosis." PRC's conclusion was crystal clear, however: Plaintiff "needed" 60-90 days of inpatient "treatment"—right there at PRC—at a cost to Plaintiff of more than $50,000. By that time, Plaintiff had been forced to resign from his toxic fellowship position at LSU. However, HPFL threatened to report him to the Board for disciplinary action if he did not do what PRC said

38.     The report's "diagnostic formulation" for Plaintiff was a confused mix of historical information (including his resignation from the fellowship program); supposed conditions "in sustained remission"; general categories of purported "personality traits"; several "other," "unspecified" and "possible" issues; and "self-reported" matters.  Nonetheless, PRC prescribed a 90-day inpatient stay at PRC for "treatment."

39.     Nothing in the PRC report explained how this diagnosis and the treatment plan was within the scope of PRC's assignment from HPFL, or within the scope of HPFL's original interest as received from LSU, which was Plaintiff's fitness to train as a fellow.  Nor was it within the scope of HPFL's self-determined modification of that interest, which was Plaintiff's fitness to have a medical license generally.

40.     Plaintiff had neither the funds nor inclination to spend two or three months in inpatient "treatment" when, as a physician himself, he did not believe it was medically necessary. Following through on its threat, HPFL reported him to the Board as a potentially impaired physician who was "non-compliant" with HPFL, ignoring that Plaintiff had not been referred by the Board in the first place and was not otherwise obligated to "comply" with HPFL and PRC.

41.     Plaintiff objected to PRC's diagnoses and treatment plan and objected more broadly to HPFL's continued involvement in his affairs for no legitimate reason.  HPFL admitted PRC's report was incorrect, even fraudulent, and ordered Plaintiff to report for a new evaluation at TRC

in Baton Rouge, Louisiana.

42.     TRC is primarily an outpatient substance abuse treatment facility, yet there had been no event or test result suggesting substance abuse by Plaintiff. Like LSU and Embley, HPFL issued mandates to Plaintiff on the basis of his history of having a disability (the condition treated in 2011 and thereafter in remission), and because he was regarded to have that disability, not because there was any evidence the condition was active.

43.     At this time, Plaintiff hired two well-respected Louisiana psychiatrists to conduct fit-for-duty examinations and report to HPFL.  Both of these experts identified numerous flaws and inaccuracies in the PRC report, and both expressed full confidence, after personally conducting evaluations, that Plaintiff was indeed fit to practice medicine.

44.     One of these experts was a faculty member at LSU itself—a Clinical Assistant Professor of the LSU Department of Psychiatry.  The other was a faculty member at Tulane University—the Chair and Professor of Psychiatry & Behavioral Sciences.

45.     Unpersuaded by Plaintiff's objections and two favorable fit-for-duty reports, HPFL reported him as "non-compliant" to LSBME (which had never before been involved) making the false statement that Plaintiff had a potential substance abuse problem and/or mental health condition that impaired his ability to practice medicine.  It also reported that he was non-compliant with HPFL's directives and with the PRC treatment plan, ignoring that HPFL had already rejected the PRC plan as improper.

46.     HPFL refused to consider these evaluations but abandoned its reliance on PRC's evaluation and ordered Plaintiff again to report for yet another evaluation by TRC. With the Board's approval, HPFL continued to wield the coercive threat of disciplinary action against his license if Plaintiff refused. Plaintiff met with TRC, but it refused to read or consider Plaintiff's

evaluations from the two independent psychiatrists and insisted that TRC provide (and charge Plaintiff for) its own analysis and treatment regimen.

47.     Plaintiff declined because TRC was a substance abuse treatment center and no one had even suggested, much less supported with evidence, that he had any substance abuse problem, which he did not.  In fact, even the PRC report (in addition to the two independent psychiatrists) had ruled out such an issue. Plaintiff, through his attorneys, attempted to negotiate some other solution with the Board. But the final straw was when the Board, still threatening to summarily suspend Plaintiff's license at any time, insisted in July 2020 that Plaintiff go to another multi-day inpatient evaluation at PRC or a similar center. Such required inpatient evaluation was likely to result in another incomprehensible "diagnosis" and self-interested requirement that Plaintiff spend 60-90 days more for "treatment" at a cost to Plaintiff exceeding $50,000.

48.     On October 4, 2019, LSBME notified Plaintiff he was under investigation for "possible violations of the [Louisiana] Medical Practice Act" because he "was noncompliant with [HPFL's] recommendations as well as the recommendations from his PRC evaluation."  LSBME stated that "the easiest way to resolve this case would be through the full cooperation of Plaintiff with the recommendations of the HPFL and PRC."

49.     LSBME did not identify any adverse event, act, or omission by Plaintiff that might have constituted a violation of the Medical Practice Act, nor did it explain why "non-compliance" with HPFL or PRC mandates, standing alone, should affect Plaintiff's medical license.

50.     The Board opened an investigation based on HPFL's complaint and told Plaintiff that the "best way" to resolve the threat to his physician's license was to do what HPFL and PRC told him to do. Hoping to mollify HPFL and convince it there was no need for inpatient treatment, Plaintiff commissioned psychological evaluations from two well-respected and independent

psychiatrists at Louisiana universities, both of whom found no impairment issues or other reason for interference in his life or his practice of medicine.

51.     In short, LSBME did not "open an investigation" at all. Nor did it engage in any deliberative process about Plaintiff, or his fitness for duty, or whether his license should be suspended or terminated. Instead, LSBME simply commenced an <u>enforcement</u> action against Plaintiff, which unlawfully skipped over the investigation and due process stages. LSBME flatly threatened, on several occasions over the course of an entire year, to abruptly suspend Plaintiff's license on an "emergency" basis unless he complied with the fraudulent treatment and monitoring plan of HPFL and PRC to undergo 60-90 days of inpatient treatment costing more than $50,000.

52.     Still trying to satisfy HPFL as the agent of LSME, Plaintiff met with TRC in Baton Rouge on December 4, 2019 and explained that he had already been cleared by two top psychiatrists at Louisiana's leading institutions.  At that meeting, TRC refused to review, discuss or accept copies of the reports by the two psychiatrists, insisting instead it needed to conduct its own evaluation and generate (and charge Plaintiff for) TRC's own treatment and monitoring plan.

53.     This was the final straw for Plaintiff, and he declined to participate further with TRC. Instead, his attorneys wrote HPFL on February 20, 2020 to reiterate that two leading experts had found him fit for duty, and to demand that HPFL close Plaintiff's file and advise LSBME there was no basis for further review or action against his current license.

54.     Neither HPFL nor LSBME responded to this letter, and LSBME subsequently stated it was never passed along to LSBME from HPFL. LSBME contacted Plaintiff in June and July 2020, following up on his matter. After discussions with Plaintiff's attorneys, LSBME still insisted that Plaintiff's license was subject to immediate suspension at any time and that to avoid this he must have <u>yet another</u> OPME done.

55.     LSBME gave Plaintiff his choice of four facilities, none of which were located in Louisiana. One of those four was PRC. Another was a dead end that did not offer such services. The other two, like PRC, have a reputation for over-diagnosing and over-treating physicians referred coercively by their state medical boards, employers, or others with career-ending leverage to force the physicians' cooperation.

56.     Additionally, the effect of Defendants' misconduct went beyond Louisiana alone. In September 2019, Plaintiff applied for physician's license from the Mississippi State Board of Medical Licensure. It notified him on March 12, 2020 that it was suspending its processing of his application until he reported to HPFL's counterpart in that state, namely the Mississippi Physician Health Program ("MPHP").  Upon information and belief, this was the result of a defamatory false report to the Mississippi board by LSBME and/or by HPFL based on the false record created by Defendants.

57.     Rather than choosing between the two unacceptable options given him by LSBME—waive his civil rights or lose his license—Plaintiff chose to allow his Louisiana license to lapse in July 2020. He regrettably moved to a different state to try to earn his living. There had been no end in sight to the surreal merry-go-round that began with Jain's false statement.

58.     As alleged above, no evidence existed, or was later discovered, to support the referral of Plaintiff from Jain to CAP; or from CAP to the LSU psychiatrist; or from him to HPFL; or from HPFL to PRC (and later TRC); or from HPFL to LSBME.

**INJURY**

59.     Plaintiff has suffered a variety of injuries to his career, reputation and professional opportunities as a result of Defendants' misconduct. Among other things:

    a.     Plaintiff lost his fellowship position at LSU (*i.e.*, he was "suspended" on

14

May 23, 2019 and never allowed to return);

b.     Plaintiff was unable to transfer to any other institution to finish his fellowship training due to the permanent stains on his training and licensing records created by Defendants;

c.     Plaintiff lost his Louisiana physician's license and was compelled to leave the state to find work elsewhere;

d.     The permanent stains created by Defendants on Plaintiff's training and licensing records have, and will continue to, prevent him and/or substantially complicate his efforts to obtain physician's licenses in other states; employment by physician groups; admitting privileges at hospitals; approved status with healthcare insurers; and obtain other professional opportunities.

60.     Additionally, Plaintiff has suffered a variety of direct financial injuries as a result of Defendants' misconduct. Among other things:

a.     Loss of the salary paid for his work in the fellowship position;

b.     Out-of-pocket costs incurred in attempting to satisfy Defendants' demands, including amounts paid for testing, psychological evaluations, the inpatient OPME at PRC;

c.     Out-of-pocket costs incurred in attempting to enforce his civil rights, including attorneys' fees;

d.     Loss of future income as a board-certified cardiologist.

61.     Plaintiff has also suffered emotional distress as a result of Defendant's misconduct.

## COUNT 1
## PROCEDURAL DUE PROCESS

62.     Plaintiff adopts and incorporates by reference all allegations set forth herein.

63.     Plaintiff asserts this claim against LSU and LSBME under the Procedural Due

Process clause of the Fourteenth Amendment to the United States Constitution.

64.     The Fourteenth Amendment states "…nor shall any State deprive any person of life, liberty, or property, without due process of law." These Defendant violated the Procedural Due Process aspect of this clause in several ways.

65.     For example, Plaintiff had protectible property or liberty interest in continuing his training in the LSU cardiology fellowship program. As detailed above, LSU deprived Plaintiff of this by summarily suspending him on May 23, 2020, which eventually turned into termination. Plaintiff was not given any reasonable notice of the allegations against him before being suspended (or after), nor any opportunity to review or contest LSU's "supporting evidence," if any, or present his own rebuttal evidence.

66.     Additionally, Plaintiff had a protectible property or liberty interest in not being subjected to unjustified and coerced psychological examinations. As detailed above, LSU and LSBME deprived him of this by coercing him to submit to the OMPEs by Whitfield, and later PRC, in order to (he thought) save his career. Plaintiff was not given any reasonable notice of why the OMPEs were necessary; nor any opportunity to review or contest the supposed basis for such demands by LSU and LSBME; nor present his own rebuttal fit-for-duty reports and other evidence.

67.     Moreover, Plaintiff had a protectible property or liberty interest in his Louisiana physicians' license and its good standing, as well as his professional reputation. As detailed above, LSU and LSBME by their improper actions put his license at risk of emergency suspension on a daily basis, and falsely stigmatized Plaintiff and his professional reputation. Plaintiff was not given any reasonable notice of why the false accusations against him persisted, nor any reasonable hearing by which he could clear himself through his rebuttal fit-for duty reports and other evidence.

68.     As detailed above, Plaintiff suffered severe damages and injury by the Procedural

Due Process violations committed by LSU and LSBME.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against LSU and LSBME:

A.   Injunctive relief compelling LSU to reinstate Plaintiff to its cardiology fellowship program to complete his training;

B.   Injunctive relief compelling these Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.   Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.   An award of Plaintiff's attorneys' fees and costs of this suit; and

E.   Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT 2

## <u>SUBSTANTIVE DUE PROCESS</u>

69.   Plaintiff adopts and incorporates by reference all allegations set forth herein.

70.   Plaintiff asserts this claim against LSU and LSBME under the Substantive Due Process clause of the Fourteenth Amendment to the United States Constitution.

71.   The Fourteenth Amendment states "…nor shall any State deprive any person of life, liberty, or property, without due process of law." These Defendants violated the Substantive Due Process aspect of this clause in several ways.

72.     For example, Plaintiff had protectible property or liberty interest in continuing his training in the LSU cardiology fellowship program. As detailed above, LSU deprived Plaintiff of this by summarily suspending him on May 23, 2020, which eventually turned into termination. LSU acted in an arbitrary and capricious manner that substantially departed from accepted norms in such situations.

73.     Additionally, Plaintiff had a protectible property or liberty interest in not being subjected to unjustified and coerced psychological examinations. As detailed above, LSU and LSBME deprived him of this by coercing him to submit to the OMPEs by Whitfield, and later PRC, in order to (he thought) save his career. LSU and LSBME acted in an arbitrary and capricious manner that substantially departed from accepted norms in such situations.

74.     Moreover, Plaintiff had a protectible property or liberty interest in his Louisiana physicians' license and its good standing, as well as his professional reputation. As detailed above, LSU and LSBME by their improper actions put his license at risk of emergency suspension on a daily basis, and falsely stigmatized Plaintiff and his professional reputation. LSU acted in an arbitrary and capricious manner that substantially departed from accepted norms in such situations.

75.     As detailed above, Plaintiff suffered severe damages and injury by the Substantive Due Process violations committed by LSU and LSBME.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against LSU and LSBME:

A.      Injunctive relief compelling LSU to reinstate Plaintiff to its cardiology fellowship program to complete his training;

B.      Injunctive relief compelling these Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to

any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.     Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.     An award of Plaintiff's attorneys' fees and costs of this suit; and

E.     Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT 3
### SECTION 1983 DEPRIVATION
### PROCEDURAL AND SUBSTANTIVE DUE PROCESS

76.     Plaintiff adopts and incorporates by reference all allegations set forth herein.

77.     Plaintiff asserts this claim against private Defendants HPFL, Hammond, PRC, and Williams under 42 U.S.C. § 1983, and against Defendants Jain, Bishop-Baier, Whitfield, and Cresswell in their private and official capacities under 42 U.S.C. § 1983 and the *Ex parte Young* doctrine, for deprivation of Plaintiff's Procedural and Substantive Due Process rights under the Fourteenth Amendment to the United States Constitution.

78.     Section 1983 states "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…". 42 U.S.C. § 1983.

79.     These Defendants, acting under color of law, deprived Plaintiff of his rights under

the Procedural and Substantive Due Process Clauses of the Fourteenth Amendment to the Constitution. That clause states, "…nor shall any State deprive any person of life, liberty, or property, without due process of law."

80.     For example, Plaintiff had protectible property or liberty interest in continuing his training in the LSU cardiology fellowship program. As detailed above, Jain, Bishop-Baier, and Whitfield (in their official capacities for LSU and their private capacities), HPFL, and Hammond deprived Plaintiff of this by summarily suspending him on May 23, 2020, which eventually turned into termination. Plaintiff was not given any reasonable notice of the allegations against him before being suspended (or after), nor any opportunity to review or contest LSU's "supporting evidence," if any, or present his own rebuttal evidence. Moreover, Defendants acted in arbitrary and capricious manners that substantially departed from accepted norms in such situations.

81.     Additionally, Plaintiff had a protectible property or liberty interest in not being subjected to unjustified and coerced psychological examinations. As detailed above, LSU and LSBME deprived him of this by coercing him to submit to the OMPEs by Whitfield, and later PRC, in order to (he thought) save his career. Plaintiff was not given any reasonable notice of why the OMPEs were necessary; nor any opportunity to review or contest the supposed basis for such demands by LSU and LSBME; nor present his own rebuttal fit-for-duty reports and other evidence. Moreover, Defendants acted in arbitrary and capricious manners that substantially departed from accepted norms in such situations.

82.     Moreover, Plaintiff had a protectible property or liberty interest in his Louisiana physicians' license and its good standing, as well as his professional reputation. As detailed above, LSU and LSBME by their improper actions put his license at risk of emergency suspension on a daily basis, and falsely stigmatized Plaintiff and his professional reputation. Plaintiff was not given

any reasonable notice of why the false accusations against him persisted, nor any reasonable hearing by which he could clear himself through his rebuttal fit-for duty reports and other evidence. Moreover, Defendants acted in arbitrary and capricious manners that substantially departed from accepted norms in such situations.

83.     More specifically, and as detailed above:

a.      Jain accused Plaintiff of impairment falsely, knowingly published that false statement to HPFL and PRC, and in other respects did not comply with applicable legal or professional standards;

b.      Whitfield falsely stated he could not conclude Plaintiff was fit-for-duty, knowingly published that false statement to HPFL, attempted to conceal Plaintiff's coerced activities as "voluntary," and in other respects did not comply with applicable legal or professional standards;

c.      Baier-Bishop attempted to conceal Plaintiff's coerced activities as "voluntary," knowingly published false statements to HPFL, PRC and LSBME, and in other respects did not comply with applicable legal or professional standards;

d.      HPFL and Hammond attempted to conceal Plaintiff's coerced activities as "voluntary," knowingly published false statements to LSU, PRC and LSBME, knowingly disregarded Plaintiff's legitimate fit-for-duty reports, knowingly accepted and endorsed the false and fraudulent PRC report, and in other respects did not comply with applicable legal or professional standards;

e.      PRC and Williams falsely stated they could not conclude Plaintiff was fit-for-duty, attempted to conceal Plaintiff's coerced activities as "voluntary," knowingly published false statements to LSU, HPFL and LSBME, knowingly disregarded Plaintiff's legitimate fit-for-

duty reports, knowingly created and promoted the false and fraudulent PRC report, and in other respects did not comply with applicable legal or professional standards; and

       f.     Cresswell falsely stated he could not conclude Plaintiff was fit-for-duty, attempted to conceal Plaintiff's coerced activities as "voluntary," knowingly disregarded Plaintiff's legitimate fit-for-duty reports, knowingly accepted and endorsed the false and fraudulent PRC report, and in other respects did not comply with applicable legal or professional standards.

84.    As detailed above, Plaintiff suffered severe damages and injury by the Section 1983 deprivation of rights committed by these Defendants.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants HPFL, Hammond, PRC, Williams, Jain, Bishop-Baier, Whitfield, and Cresswell:

A.    Injunctive relief compelling LSU to reinstate Plaintiff to its cardiology fellowship program to complete his training;

B.    Injunctive relief compelling these Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.    Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

D.    An award of Plaintiff's attorneys' fees and costs of this suit; and

E.    Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

**COUNT 4**

**<u>SECTION 504 OF THE REHAB ACT</u>**

85.     Plaintiff adopts and incorporates by reference all allegations set forth herein.

86.     Plaintiff brings this claim against LSU and PRC under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

87.     Section 504 provides that "no otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

88.     Section 504 applies to recipients of federal funds, including "all of the operations…of a college, university, or other postsecondary institution, or a public system of higher education." 29 U.S.C. § 794(b)(2)(A). LSU is the recipient of hundreds of millions of dollars annually in federal funds, including student loans, grants and contracts. PRC has also been the recipient of federal funds, including approximately $80,000 under five (5) contracts with the U.S. Department of State.

89.     At all times relevant to this action, Plaintiff had a disability as defined by the ADA, because he had substance use disorder in remission since 2011; a record of that disability, including supplemental entries to that record by LSU and PRC through their activities; and was "regarded" as having a disability by both LSU and PRC. 42 U.S.C. § 12102.

90.     The following are specific examples of Defendants discriminating against Plaintiff in violation of Section 504:

      a.     As detailed above, Jain suspending Plaintiff on May 23, 2019;

      b.     As detailed above, suspension becoming termination when Plaintiff was

23

never allowed to return;

    c.     As detailed above, Jain falsely accusing Plaintiff of mental impairment;

    d.     As detailed above, Jain ordering Plaintiff to obtain a fit-for-duty determination from CAP as a condition of returning to training;

    e.     As detailed above, Plaintiff's former therapist, Embley, acting as the investigator and compliance officer for Plaintiff's fit-for-duty proceedings;

    f.     As detailed above, Embley ordering an unjustified urinalysis test;

    g.     As detailed above, Embley breaching the confidentiality of Plaintiff's voluntary, therapeutic records and using the 2011 treatment of his disability in remission as a basis to order an unjustified OPME;

    h.     As detailed above, LSU's agent Whitfield conducting an unjustified OPME;

    i.     As detailed above, LSU's agent Whitfield ordering a second, unjustified, inpatient OPME;

    j.     As detailed above, LSU's agent Whitfield ordering Plaintiff to register with HPFL and follow all of its determinations regarding evaluation, treatment and monitoring;

    k.     As detailed above, LSU's agent HPFL ordering Plaintiff to comply with Whitfield's order to submit to a second, unjustified, inpatient OPME;

    l.     As detailed above, LSU's agent PRC conducting the second, unjustified, inpatient OPME;

    m.     As detailed above, LSU's agent PRC issuing a false and fraudulent report to HPFL stating that Plaintiff was unfit for duty unless he submitted to, and paid for, 60-90 days of inpatient treatment at PRC;

    n.     As detailed above, LSU's agent HPFL conveying the false and fraudulent

PRC report to LSU;

o.    As detailed above, LSU extending Plaintiff's suspension pending compliance with treatment at PRC;

p.    As detailed above, after Plaintiff ceased his futile efforts to satisfy LSU's requirements for reinstatement, LSU's agent HPFL reporting this "non-compliance" to LSBME and becoming its agent for purposes of continuing the effort against Plaintiff;

q.    As detailed above, LSBME becoming involved as the coercive force against Plaintiff and threatening to summarily terminate his physician's license unless he complied with HPFL's order to submit to 60-90 days of treatment at PRC;

r.    As detailed above, LSBME and/or HPFL reporting some or all of these events to the Mississippi medical board and/or HPFL's counterpart in Mississippi;

91.    As detailed herein, this discrimination by LSU and PRC was intentional, and due solely to Plaintiff's disability.

92.    As detailed above, Plaintiff suffered severe damages and injury by the Section 504 violations committed by these Defendants.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants LSU and PRC

A.    Prospective injunctive relief compelling these Officials to reinstate Plaintiff to his fellowship position in the LSU cardiology fellowship program to resume his training;

B.    Prospective injunctive relief compelling these Officials to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that

Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.     An award of compensatory damages for intentional discrimination;

D.     An award of attorneys' fees and costs of this suit; and

E.     Award such other relief available in law or in equity as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT 5
### SECTION 1983 DEPRIVATION
### ADA TITLE II DISABILITY DISCRIMINATION

93.     Plaintiff adopts and incorporates by reference all allegations set forth herein.

94.     Plaintiff asserts this claim against private Defendants HPFL, Hammond, PRC, and Williams under 42 U.S.C. § 1983, and against Defendants Jain, Bishop-Baier, Whitfield, and Cresswell in their private and official capacities under 42 U.S.C. § 1983 and the *Ex parte Young* doctrine, for violations of Plaintiff's rights under Title II of the ADA.

95.     Section 1983 states "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…". 42 U.S.C. § 1983.

96.     These Defendants, acting under color of law, deprived Plaintiff of his rights under ADA Title II. That statute  states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

12132. This obligation of non-discrimination extends to "all of the operations…of a college, university, or other postsecondary institution, or a public system of higher education." 29 U.S.C. § 794(b)(2)(A).

97.     At all times relevant to this action, Plaintiff had a disability as defined by the ADA, because he had substance use disorder in remission since 2011; a record of that disability, including supplemental entries to that record by LSU and PRC through their activities; and was "regarded" as having a disability by both LSU and PRC. 42 U.S.C. § 12102.

98.     As detailed herein, these Defendants excluded Plaintiff from LSU's cardiology residency program, denied him the benefits of its training, and discriminated against him by suspending him without justification, conditioning his return on unlawfully administered OMPEs and compliance with dictates of HPFL, and in several other ways.

99.     As set forth above, Plaintiff has been denied access to the services, programs, facilities, activities and accommodations offered by LSU solely by reason of his perceived disability and erroneous record of a disability, and has otherwise been discriminated against and damaged solely by reason of his disability as a result of Defendants' ADA Title II violations as set forth above.

100.     As detailed herein, this discrimination by Defendants was intentional, and due solely to Plaintiff's disability.

101.     As detailed above, Plaintiff suffered severe damages and injury by the Section 1983 deprivation of rights committed by these Defendants.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendant LSU:

A.      Injunctive relief compelling LSU to reinstate Plaintiff to its cardiology fellowship program to complete his training;

B.      Injunctive relief compelling these Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

C.      An award of compensatory damages for intentional discrimination;

D.      An award of Plaintiff's attorneys' fees and costs of this suit; and

E.      Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

## COUNT 6
## EMOTIONAL DISTRESS

102.    Plaintiff adopts and incorporates by reference all allegations set forth herein.

103.    Plaintiff asserts this claim for intentional infliction of emotional distress against Defendants Jain, Bishop-Baier, Whitfield, HPFL, Hammond, PRC, Williams, and Cresswell under Article 2315 of the Louisiana Civil Code.

104.    As detailed above, each of these Defendants' respective actions was extreme and outrageous.

105.    As detailed above, each of the emotional distress suffered by Plaintiff as a result of each Defendant's actions was severe.

106.    Each of these Defendants desired to inflict severe emotional distress or knew that it would be certain or substantially certain to result from their conduct.

28

107.    As a proximate result of the emotional distress caused by these Defendants, Plaintiff has suffered the loss of his chosen subspecialty, has lost income and earning capacity, has suffered pecuniary damages and out of pocket costs, and has suffered other losses.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.      Injunctive relief compelling these Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

B.      Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

C.      Punitive damages in an amount to be determined at trial;

D.      An award of attorneys' fees and costs of this suit; and

E.      Such other relief available in law as this Court shall deem appropriate

Plaintiff demands trial by jury.

## COUNT 7
### <u>DEFAMATION</u>

108.    Plaintiff adopts and incorporates by reference all allegations set forth herein.

109.    Plaintiff asserts this claim against Defendants Jain, Bishop-Baier, Whitfield, HPFL, Hammond, PRC, Williams, and Cresswell under Article 2315 of the Louisiana Civil Code.

110.    As detailed above, all of these Defendants made false statements about Plaintiff.

111.    As detailed above, all of these false statements by each of these Defendants was

made intentionally, knowingly, and/or with a level of intent sufficient to make them culpable.

112.    As detailed above, as a proximate result of the defamation committed by each of these Defendants, Plaintiff has suffered the loss of his chosen subspecialty, has lost income and earning capacity, has suffered pecuniary damages and out of pocket costs, and has suffered emotional distress.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief against these Defendants:

A.    Injunctive relief compelling these Defendants to expunge from or seal their records to the extent that they indicate in any way that Plaintiff resigned or was subject to any impairment inquiry, and to insert in such record an indication (to be made available to other programs, licensing boards, or other proper inquirers in the future) that Plaintiff's training period exceeded the normal period because he had been improperly dismissed before being reinstated for completion of his training;

B.    Compensatory damages for economic and non-economic injuries in an amount to be determined at trial;

C.    Punitive damages in an amount to be determined at trial;

D.    An award of Plaintiff's  attorneys' fees and costs of this suit; and

E.    Such other relief available in law as this Court shall deem appropriate.

Plaintiff demands trial by jury.

Dated: November 3, 2020.

*/s/ Edward R. Moor*

Edward R. Moor, T.A. (IL Bar No. 6205169)
Moor Law Office, P.C.
One N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 726-6207

30

erm@moorlaw.net
*Admitted Pro Hac Vice*

and

Kerry Murphy (La. Bar. No. 31382)
kmurphy@laskymurphy.com
Katie Lasky (La. Bar No. 28652)
klasky@laskymurphy.com
Lasky Murphy LLC
715 Girod Street, Suite 250
New Orleans, Louisiana 70130
(504) 603-1500

and

Jeffrey Weisman (IL Bar No. 6295539; DC Bar No.
      986696)
Marek Weisman LLC
55 E Monroe Street, Suite 3800
Chicago, Illinois 60603
(312) 470-7662
jweisman@marekweisman.com
*Admitted Pro Hac Vice*

***Attorneys for Plaintiff***