## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

---------------------------------------------------------

GREGORY J. DUHON, M.D.,

        Plaintiff,

     v.

THE BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY AND
AGRICULTURAL AND MECHANICAL
COLLEGE, LOUISIANA STATE BOARD OF
MEDICAL EXAMINERS, HEALTHCARE
PROFESSIONALS FOUNDATION OF
LOUISIANA, PROFESSIONAL RENEWAL
CENTER, P.A., NEERAJ JAIN, M.D.,
MARGARET BISHOP-BAIER, M.D., ERIK A.
WHITFIELD, M.D., JAMES DAVID
HAMMOND, M.D., BETSY WHITE
WILLIAMS, M.D., and LAWRENCE H.
CRESSWELL, M.D.,

        Defendants.

---------------------------------------------------------

CASE NO. 20-cv-2022-KTM-KWR

JUDGE MILAZZO

MAGISTRATE JUDGE ROBY

JURY TRIAL DEMANDED

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT WILLIAM'S RULE 12(b)(2) and 12(b)(6) MOTION TO DISMISS

Plaintiff Gregory J. Duhon respectfully submits this memorandum in opposition to the Motion to Dismiss filed by Defendant Dr. Betsy White Williams ("Williams") (Dkt. 101). As discussed herein, Plaintiff's Amended Complaint (Dkt. 55) satisfies Fed. R. Civ. P. 12(b)(2) by pleading allegations that establish the Court's personal jurisdiction over Defendant Williams, and it also satisfies 12(b)(6) by pleading sufficient facts to permit this Court to draw the reasonable inference that Williams is potentially liable under Counts 3, 5, 6, and 7. The Motion to dismiss should be denied.

## I.    INTRODUCTION

Plaintiff's Amended Complaint details his allegations against Professional Renewal Center P.A. (PRC) and Williams. The Amended Complaint identifies PRC and Williams but thereafter refers to them collectively as "PRC." Plaintiff clarified in his affidavit that much of his interaction with PRC involved Williams, and that she had a personal role in the misconduct alleged.[1]

Defendant claims in her brief that she is merely a corporate officer of PRC. In the argument section of her 12(b)(6) motion, Defendant Williams claims that the statement of facts section of Plaintiff's Amended Complaint does not contain a single factual allegation regarding Williams. Dkt. 101-2T at 10. Contrary to Defendant's argument, Williams took an active role in soliciting business from the Healthcare Professionals Foundation of Louisiana (HPFL) and individual Louisiana physicians for her Clinic. PRC routinely contracts directly with the medical boards of the states from which it receives referrals.[2] Williams owns PRC[3] and is its Clinical Director.[4] Further, in this case, Williams was personally instrumental in the creation and publication of a defamatory report regarding Plaintiff's fitness to practice medicine, and she personally solicited Plaintiff to return to Kansas for further treatment while he was in Louisiana.[5]

Dr. Williams and her company, PRC, have a referral agreement with co-defendant HPFL in which the HPFL would refer physicians suspected mental impairment to PRC for occupationally

---

[1] Dkt. 85-3, Declaration of Gregory J. Duhon, M.D.

[2] For a description of PRC's business model, including its master contracts with state PHPs like HPFL, *see Peterson v. Martinez*, 2017 WL 6418224 (Ct. App. Minn. Dec. 18, 2017).

[3] Pltf. Group Ex. 1, Kansas Secretary of State business search result on PRC and PRC's filed Annual Report listing Williams as the sole officer and board member of PRC.

[4] *See* Dkt. 96 at Sealed Ex. A, signature pages of the Preliminary Evaluation and the Discharge Summary.

[5] *Id.* and Dkt. 85-3, Duhon Dec., at ¶ 7-8.

mandated psychological evaluations ("OMPE").[6] Under such agreement, Dr. Williams and PRC regularly evaluate Louisiana physicians. As part of this agreement, Williams and her staff generate reports opining on a Louisiana physician's ability to practice medicine which would be sent to the HPFL in Louisiana and could be used as evidence in license related proceedings.[7]

On May 23, 2019, Plaintiff was informed by his Program Director (Defendant Jain) he was being suspended from his fellowship positions at LSU, based on suspicion of mental impairment.[8] Plaintiff was initially evaluated by LSU's Campus Assistance Program (LSU-CAP). Plaintiff complied with LSU-CAP's investigation by providing a (negative) urinalysis sample and completing an OMPE with Defendant Whitfield.[9] Dr. Whitfield was unable to make a determination as to Plaintiff's fitness to practice despite four one-hour sessions with Plaintiff.[10] Plaintiff was reported to the HPFL based on Whitfield's report for suspicion of impairment. HPFL subsequently referred Plaintiff to the Professional Renewal Center (PRC) in Lawrence, Kansas to receive another more extensive three-day OMPE.[11]

Plaintiff scheduled his appointment at PRC over the phone while he was still in Louisiana.[12] Upon arriving in Lawrence Kansas, Dr. Duhon went to PRC to submit to his OMPE at a cost of $6,500.[13] The first person he encountered when he arrived at PRC was Defendant Williams. Defendant Williams introduced herself as a doctor that worked at the Clinic. Defendant Williams

---

[6] Dkt. 55 at ¶¶ 32-33; and *see* https://prckansas.org/wp/ at "Referral Sources" (last accessed 3-21-21), and Dkt. 96 at Ex. A where the Preliminary Assessment and Discharge Summary are written for the referring entity.
[7] *Id.*
[8] *Id.* at ¶21.
[9] *Id.* at ¶28
[10] *Id.* at ¶ 29.
[11] *Id.* at ¶ 31
[12] *Id.* at ¶ 32-33.
[13] Dkt. 55 at ¶ 34.

spoke with Plaintiff for nearly an hour during this initial interview. Williams did not disclose that she was a corporate officer of PRC and gave no reason for Plaintiff to believe that she was meeting with him in her capacity as a corporate officer instead of a mental health professional.[14]

At the end of his three day exam by PRC, staff told Plaintiff that he would "have to return for treatment" an instruction that Plaintiff understood to be from Williams. [15]

Williams contacted Plaintiff after he returned to Louisiana. She authored and sent HPFL and Plaintiff a preliminary report on July 29, 2019.[16] Duhon received a final report which was identical to the preliminary report except it included supplemental lab reports (all of which showed no traces of alcohol or drugs which Duhon did not have a prescription for).[17] The final report was also went to HPFL.

The reports made no determination of Duhon's fitness to practice medicine or a diagnosis of any mental impairment.[18] Despite any evidence of impairment, the reports rattled off a list of personality traits unrelated to Duhon's fitness to practice medicine and recommended that Duhon submit to a 90-day in-patient treatment plan that would have cost Plaintiff $50,000.[19] The report was missing a signature of the only psychiatrist on the letterhead and Defendant Williams, who identified herself as the "clinical program director" and a "licensed psychologist" had her signature at the top.[20] After Plaintiff made clear to Williams that he could not afford her proposed treatment plan, Williams and PRC ceased communications with him.

---

[14] Dkt. 85-3, Duhon Dec., at ¶ 5.
[15] Dkt. 85-3 at ¶ 6.
[16] Dkt. 96 at Sealed Ex. A.
[17] *Id*. at p 17-18.
[18] Dkt 55 at ¶ 37.
[19] *Id*.
[20] Dkt. 96 at Sealed Ex. A, pp. 9 and 18.

Williams' actions in generating a flawed and defamatory report and publishing the report to HPFL resulted in a dark and permanent stain on Plaintiff's licensing and employment records that continues to harm him on an ongoing basis.[21] Two prominent psychiatrists in Louisiana, one on the faculty of Tulane and the other on that of LSU itself,[22] evaluated Plaintiff and declared him fit-for-duty, and both were highly critical of Williams and PRC's OMPE report and identified numerous flaws and inaccuracies in the report. Williams' authorship and publication of this report which she knew would impact Plaintiff's medical career a make her liable in her personal capacity for counts 3, 5 , 6, and 7 in the Amended Complaint.

Lastly, Williams erroneously claims that HPFL abandoned its reliance on the fraudulent PRC report that she signed.  Dkt. 101-1 at 4.  While Plaintiff does allege that HPFL told him that PRC/Williams' report was "incorrect, even fraudulent,"[23] Plaintiff also alleges that HPFL and the LSBME continued to rely on it to in threatening and constructively terminating his license.[24]

## II.    LEGAL STANDARDS UNDER FRCP RULE 12(b)(2) and 12(b)(6)

When  "a  court  rules  on  a motion to dismiss for lack of  personal jurisdiction without holding an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction."[25] To prevail on a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of making a prima-facie showing the proponent of the Motion has sufficient contacts with the State of Louisiana to establish personal jurisdiction over the nonresident[26]. In doing so, however, the Court must accept the allegations of the complaint as

---

[21] *Id.*  ¶¶ 56-57, 59(d).
[22] Dkt. 55 at ¶ 43.
[23] Dkt. 55 at ¶ 41.
[24] *Id.* at ¶¶. 45, 48, and 50.
[25] *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990)(citations omitted)).
[26] *Bullion v. Gillespie*, 895 F.2d 213 (5th Cir. 1990).

true except as controverted by the defendant's affidavits, and conflicts in the affidavits are resolved in plaintiff's favor.[27]

To prevail on a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the complaint must plead enough facts to state a claim for relief that is plausible on its face.[28] Claims are plausible on their face when the pleaded facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.

## III.    ARGUMENT

### A.    The Court Has Personal Jurisdiction Over Defendant Williams

The crux of Defendant's brief is that because Plaintiff jointly referred to Williams and PRC as "PRC" in its amended complaint, that it is unfair to attribute any of the allegations to Williams. Dkt. 101-2 at 9. Further, Williams incorrectly contends that lack of physical presence in Louisiana is the determinative factor in establishing whether this Court can exercise personal jurisdiction.[29]

Williams makes no argument that this Court lacks personal jurisdiction over her under the federal counts, Count 3, § 1983 substantive and procedural due process, and Count 5, § 1983 Title II of the ADA. The law cited by Williams only applies to diversity cases grounded in state law. *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 237 (5th Cir. 2008), for instance, was a diversity case for fraud, breach of contract, and breach of fiduciary duty.

Defendant Williams argues that a federal court has jurisdiction over a non-resident defendant if the state's long-arm statute confers personal jurisdiction over that defendant, and if

---

[27] *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784 (5th Cir. 1990)
[28] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[29] *Id.* at 8.

the exercise that jurisdiction is consistent with due process under the United States Constitution.[30] Here, Louisiana's long arm statute permits jurisdiction over Defendant Williams. The intent of the Louisiana Long Arm Statute is to extend personal jurisdiction of the Louisiana courts over non-residents consistent with the due process clause of the Fourteenth Amendment.[31] The Louisiana Supreme Court has held that the state's long-arm statute confers personal jurisdiction to the limits of due process.[32] Louisiana's Long Arm Statute provides, in part, that:

> [a] court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident: . . . (4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if [s]he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.

La. Rev. Stat. § 13:3201(A)(4).

Here, the HPFL referral to PRC as one of three choices tendered to Plaintiff[33] demonstrates that PRC and Williams most likely regularly engage in business in Louisiana. When Williams accepts a referral from the HPFL, she understands the evaluations she generates will be sent back to Louisiana to be used by the HPFL to determine whether the referred patient can practice medicine and earn a living in Louisiana. In this case, PRC received $6,500 from Plaintiff and Williams tried to have Plaintiff pay an additional $50,000 for more treatment.[34] PRC and Williams generate revenue from every single physician referred to them through HPFL. This sort of agreement in which a non-resident systematically solicits business opportunities from a forum state is exactly the type of activity that the long arm statute contemplates.

---

[30] *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235 (5th Cir. 2008).
[31] *Id.*
[32] *Sanders v. Ball*, CIV. A. 98-2715, 1999 WL 397921, at *3 (E.D. La. June 11, 1999).
[33] Dkt. 55 at ¶ 32.
[34] Dkt. 85-3, Duhon Dec. at ¶¶ 7-8.

Here, Plaintiff's Amended Complaint alleges not only that Dr. Williams is the Clinical Director of PRC, but also that she was an active participant in the generation of PRC's OMPE reports.[35] Williams participated in every step of PRC's evaluation of Plaintiff.[36] She authored and signed the reports generated for Plaintiff[37] (and may have done the same for other Louisiana physicians referred to PRC through HPFL). Defendant Williams then sent the embarrassing and defamatory report to Louisiana for the HPFL to utilize their authority over Dr. Duhon's medical license as a cudgel to coerce him into "consenting" to invasive psychological evaluation.[38]

Louisiana physicians travel to Lawrence, Kansas for the sole purpose of receiving an OMPE overseen by Williams at PRC. This ongoing business relationship with HPFL and her involvement in Plaintiff's OMPE provides Defendant Williams with sufficient contacts with Louisiana for this Court find that she submitted to the exercise of personal jurisdiction in this case.

A two-pronged test must be satisfied in order for a court to exercise personal jurisdiction: (1) the nonresident must have minimum contacts with the forum state; and (2) the exercising of jurisdiction must be consistent with traditional notions of fair play and substantial justice.[39]

The United States Supreme Court has recognized a distinction between two types of personal jurisdiction— "general" and "specific."[40] A state exercises general jurisdiction when the defendant's contacts with the state are not related to the lawsuit. Specific jurisdiction, on the other

---

[35] Dkt. 85-3, Duhon Dec.

[36] Dkt. 55 at ¶37

[37] Dkt. 96 at Sealed Ex. A.

[38] Dkt. 55 at ¶ 37.

[39] *Sanders v. Ball*, CIV. A. 98-2715, 1999 WL 397921, at *3 (E.D. La. June 11, 1999) (*citing International Shoe Company v. State of Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L.Ed. 95 (1945)).

[40] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, fn. 15,  105 S. Ct. 2174, 2182 (1985).

hand, is exercised when the suit arises out of or is related to the defendant's contacts with the forum.[41]

Here, Williams meets the requirements for the exercise of specific jurisdiction. The test to determine if there is specific jurisdiction is whether the Defendant purposely directed h[er] activities at residents of the forum and the litigation results from alleged injuries arising out of or related to those activities.[42] Contacts may be affected by mail and electronic communication, as well as physical presence.[43] The test for minimum contacts can be satisfied by a single act or actions by which the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."[44] The nonresident's "purposeful availment" must be such that the defendant should "reasonably anticipate being hailed into court in the forum state."[45]

Louisiana courts have found that they can exercise jurisdiction over doctors even if they are not present in the State when they solicit business from Louisiana.[46] In *Sanders*, (1) the defendants (a dermatologist and his practice group) were located in Alabama and had no offices in Louisiana; (2) none of the medical treatment performed by defendants was done in Louisiana; (3) the defendant dermatologist was not licensed to practice medicine in Louisiana and his practice group had never done business in Louisiana; (4) neither defendant had done any advertising or performed any work in Louisiana; and (5) the only connection they had with Louisiana was that

---

[41] *Id.*

[42] *Id.* (citing *de Reyes v. Marine Mgmt. & Consulting, Ltd.,* 586 So.2d 103, 105 (La. 1991).

[43] *Spomer v. Aggressor Int'l, Inc.,* 807 So.2d 267, 271.

[44] *Id.* at 272; (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475.)

[45] *Eusea* 836 So. 2d 333, 337; *citing World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

[46] *Sanders v. Ball,* No. CIV. A. 98-2715, 1999 WL 397921 (E.D. La. June 11, 1999).

they sometimes received tissue samples taken from Louisiana patients for review.[47] Despite having

no physical presence in Louisiana, the court reasoned that it could exercise jurisdiction over the

Alabama doctor because he was directing his report to Louisiana.[48] Adopting the reasoning in

*Sanders,* in this case, even though Williams never left Kansas, the doctors at PRC including

Williams did not "treat" their patients affected by their evaluation, rather the treatment and thus

the effect of their evaluation by definition occurs wherever the report they generate is sent, here to

HPFL in Louisiana.[49]

In this case, as to Plaintiff, Defendant Williams purposely availed herself of Louisiana by

directing her actions towards the state. As *Sanders* shows, physical presence is not necessary to

confer personal jurisdiction over a party. It is merely one of many contacts which a court may

consider in the determination of whether a defendant has enough minimum contacts to exercise

jurisdiction. While Williams was never physically present in Louisiana (Dkt. 101-2 at  8), this

Court can exercise jurisdiction over her because in generating and publishing a false and damaging

report about Plaintiff[50] for the HPFL, she directed multiple actions to Louisiana, knowing that they

would have an effect on the Plaintiff in Louisiana.[51] As such, Williams can reasonably anticipate

being hailed into court in Louisiana. She obviously has earned income from her practice through

her ownership of PRC[52]. If she had not been paid by Plaintiff, it would be expected that she would

---

[47] *Id.* at 1.

[48] *Id.* at 4: "The Court finds such analysis highly persuasive. In the instant suit, defendants in this case clearly and purposefully directed their actions toward Louisiana."

[49] *See also Kennedy v. Freeman,* 919 F.2d 126 (10th Cir. 1990); (Oklahoma Court found to have jurisdiction over Texas pathologist who authored and mailed an inaccurate report that failed to diagnose cancer to Oklahoma).

[50] *See* Dkt. 55, at ¶¶ 4, 20, 26, 37, 40, 41, 42, 45, 49, 56, 57, 58, 67, 74, 82, 83, 90, 110, 111.

[51] *See Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir.1990).

[52] Dkt. 55 at ¶ 34, 37.

have relied on Louisiana state courts to recover her $6,500. Thus, she was able to avail herself of the protection of Louisiana laws.

The second prong of the personal jurisdiction test is whether exercising personal jurisdiction will "offend traditional notions of fair play and substantial justice."[53] With respect to the second prong, a court should consider: the burden on the defendant, the interest of the forum State, and the plaintiff's interest in obtaining relief and must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.[54] Defendant Williams' burden of defending this suit in Louisiana does not offend notions of fair play and substantial justice. It cannot be said that Williams could not have reasonably anticipated being hailed into Court in Louisiana. Certainly, she would know that any misdiagnosis (intentional or not) on her part would result in harm in the location where the actual patient resides.

This case is not analogous to the instance where a patient purposefully goes to another state, is treated there and then returns to the home state and sues the out of state doctor for malpractice. The course of conduct presented here cannot be said to be random, fortuitous, or a unilateral act of plaintiff. The difference lies in the fact that the defendants in this instance send reports into Louisiana,[55] accept business from the HPFL in Louisiana, and thus have a presence in Louisiana. Furthermore, the proximity of Kansas and Louisiana present little burden for the purpose of litigation.

---

[53] *International Shoe*, 326 U.S. 310.
[54] *Asahi Metal Ins. Co. v. Superior Court of California*, 480 U.S. 102, 115, 107 S.Ct. 1026, 1033 (1987).
[55] *See* Dkt. 55, at ¶¶ 4, 20, 26, 37, 40, 41, 42, 45, 47.

The state interests in this case are also legitimate and outweigh the defendant's' concerns. Just as Louisiana has an interest in regulating the licensing of its health care professionals, it has an interest in protecting Louisiana health care professionals. Louisiana has an interest in protecting its citizens and preventing malpractice.[56] Williams would have access to Louisiana courts to settle claims. Therefore, Defendant Williams cannot reasonably expect to benefit from her relationship with the forum state yet be shielded from suit in this state because they are nonresidents. Louisiana has a legitimate interest in preventing this alleged type of wrongdoing.

### B.   Defendant's 12(b)(6) Motion Should Be Denied

#### 1.   Plaintiff Complied with Fed. R. Civ. P. 8

Defendant Williams argues that even if this Court could properly exercise jurisdiction, that Counts 3, 5, 6, and 7 all fail to meet the pleading standards of rule 12(b)(6) because by referring to Williams and PRC in the Amended Complaint as PRC, a fair reading of the complaint does not contain a single allegation against Williams.[57] As argued above, Williams was involved in every step of PRC's action in this case and is therefore liable in her personal capacity. It is simply incorrect to state that the Plaintiff has not pled sufficient facts against Williams. For these reasons, Defendant Williams' argument for dismissal under Rule 8 should be denied.

#### 2.   Section 1983 Deprivation of Due Process (Count 3)

Defendant Williams argues that she is not capable of being sued for procedural or substantive due process violations because a) she is not a government actor, and b) Plaintiff does not specify that Williams deprived him of. As set forth below, both of these arguments are without merit and should be rejected by the Court.

---

[56] *Sanders* No. CIV. A. 98-2715, 1999 WL 397921, at *5 (E.D. La. June 11, 1999).
[57] Dkt. 101-5 at 8.

To state a claim for deprivation of substantive due process under § 1983, a plaintiff "must demonstrate: 1) he was deprived of a cognizable constitutional right; 2) the State acted with "deliberate indifference" to the protected right; and 3) the policies or practices complained of were the direct cause of the constitutional deprivation."[58] To state a claim for procedural due process under Section 1983, Plaintiff must allege facts sufficient to show that (1) he was deprived of a liberty or property interest protected by the due process clause, and (2) that he was deprived of that interest without constitutionally adequate process.[59]

Here, Plaintiff has a protected liberty or property interest in: (1) being free from unnecessary and invasive psychological evaluations;[60] maintaining his medical license in good standing;[61] and preventing damage to his professional reputation.[62] In the Amended Complaint, Plaintiff has alleged in detail how he was deprived of these interests by the Defendants without adequate due process, including the specific acts and omissions.[63] Williams' participation, by authoring and issuing to a false report was instrumental to the harm endured by Plaintiff and having

---

[58] *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018).

[59] *LaCroix v. Marshall Cty., Mississippi*, 409 F. App'x 794, 803 (5th Cir. 2011).

[60] *Taylor v. McDonald*, 978 F.3d 209, 212-13 (5th Cir. 2020) ("To be sure, in the typical case, the conditions of confinement at a psychiatric unit will be qualitatively different from those of prison, most often in the form of psychiatric treatment. That is why prisoners undoubtedly have a liberty interest in not being transferred to a psychiatric unit in the first instance.").

[61] *Boudreaux v. Larpenter*, 2011-0410 (La. App. 1 Cir. 6/1/12), 110 So. 3d 159, 170 (La. Ct. App. 2012). *See also Ensenat v. Louisiana State Bd. of Med. Examiners,* 593 So. 2d 929, 933 (La. Ct. App. 1992) (holding that "possession of a medical license gives [plaintiff] a vested property interest, which guarantees him a right to due process prior to revocation of that license."); *Scally v. Texas State Bd. of Med. Examiners*, 351 S.W.3d 434, 446 (Tex. App. 2011) (holding that a "[medical] license is a property right, but it is one that has been created by statute and is subject to the state's power to impose conditions upon the granting or revocation of the license for the protection of society.")

[62] *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972).

[63] For a concise summary of Sec. 1983 Due Process Violations, *see* Dkt. 55 at ¶¶ 83(a)-(f).

13

written it for HPFL, the agency that acts for the LSMBE in relation to "impaired physicians,"[64] and is sufficient to state a claim.

      Specifically, Plaintiff alleges that Williams falsely stated she could not conclude Plaintiff was fit-for-duty; attempted to conceal Plaintiff's coerced activities as "voluntary;" knowingly published false statements to LSU, HPFL and LSBME;  knowingly created and promoted the false and fraudulent PRC report; and that Williams' failure to comply with applicable legal or professional standards[65] means that she played a crucial role in the Plaintiff's denial of rights as she performed her role as an evaluator in an "arbitrary and capricious" manner as required for substantive due process claims.[66]  Williams' report and recommendations for further treatment were instrumental in the effort to deprive Plaintiff of his license and ability to work as a physician.[67]

      Plaintiff has a property interest in his license and has alleged that Williams aided the state in depriving him of his license. Even though LSBME is the party responsible for issuing physician's licenses, and has delegated physician evaluation to the HPFL, the contention that Williams is unable to deprive Duhon of any property interest in his physicians' license without the power to issue or take away the license, is erroneous. In the context of the regime of blind acceptance by LSBME of the recommendations and accusations against physicians made by LSU and treatment centers such as PRC, the fact that Williams does not have the direct ability to deprive Plaintiff of his medical license is irrelevant.[68] Plaintiff cites numerous facts illuminating Williams'

---

[64] *Our History,* HPFLA, http://www.hpfla.org/about-hpfl/our-history (Last accessed 1/15/2021).
[65] Dkt. 55 at ¶ 83(e).
[66] *Harrington v. Harris*, 118 F.3d 359, 368 (5th Cir.1997).
[67] Dkt. 55 at ¶¶ 35, 45, 46, 48, 51, and 54-57, and Dkt. 85-3, Duhon Dec.
[68] *See Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 580-81 (10th Cir. 1996) (holding in a due process claim brought pursuant to Sec. 1983 that Medical Center violated plaintiff's clearly established liberty interest in her professional reputation and ability to obtain future employment

ability to deprive Plaintiff of his medical license through the pattern of reliance on her report exhibited by the other defendants including the HPFL and LSBME,[69] and by LSBME's liberal threats to suspend or revocation of Plaintiff's license as a means of coercing Plaintiff into submitting to unnecessary treatment.[70]

Plaintiff has a property interest in his professional reputation, and he has alleged that Williams aided the state in ruining it. Plaintiff alleges that Jain suspended him from his clinical duties based on false accusations of mental impairment and substance abuse.[71] LSU, Jain, and Bishop-Baier relied on the false and defamatory accusations originating with Jain creating circumstances in which Plaintiff was effectively terminated.[72] Finally, Plaintiff was in fact foreclosed from a subsequent employment opportunity as a result of the stigma.[73] Plaintiff was constructively terminated from his position at LSU.  That he refused to cooperate with the unlawful mandates of HPFL, LSBME, and PRC, and allowed his medical license to lapse, does not mean Plaintiff himself was responsible for the damage to his professional reputation, considering that he was forced to do so after being presented with two unacceptable options—waive his civil rights or lose his license.[74] As an evaluator of Plaintiff, Williams adopted defamatory statements by LSU, incorporated them into her report, and published them to HPFL knowing the consequences of her untrue statements for Plaintiff's career and the authority of the HPFL could coerce him into

---

by interfering in professional licensing agency's investigation to determine Plaintiff's job status, where Medical Center had agreed to leave the decision up to the professional licensing agency.).
[69] Dkt. 55, at ¶¶ 35, 39, 45, 46, 48-54, 58.
[70] *Id.* at ¶ 51.
[71] *See, e.g., id.* at ¶¶ 21, 22, 57.
[72] *See, e.g., id.* at ¶¶ 34, 57, 58.
[73] *Id.* at ¶ 56.
[74] Dkt. 55, at ¶ 57.

returning for additional, costly treatment. Williams did not just act as a rubber stamp for LSU and Jain's statements; rather, she bears direct responsibility for her actions under Section 1983.

The actions of Williams are "fairly attributable" to the state. The exception to the general rule that Section 1983 excludes the conduct of private entities is when their conduct is "fairly attributable to the State."[75] To demonstrate this, a plaintiff must show that:

> (1) that the deprivation was caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state, or by a person for whom the state is responsible, and (2) that the party charged with the deprivation may fairly be said to be a state actor.[76]

In this case, Plaintiff alleges that HPFL "was originated by LSBME to oversee the evaluation, treatment, and monitoring of impaired or potentially impaired physicians."[77] Plaintiff further alleges that LSBME, a state agency, originated HPFL and charged it a portion of its responsibility, namely overseeing the mental health and fitness of Louisiana physicians, shows that HPFL carries out its duties pursuant to an important state interest. HPFL was expressly authorized to act on behalf of a LSBME, a state agency.[78] Plaintiff has alleged the determinative nature that reports from HPFL have over LSBME's licensing decisions.[79] HPFL's ability to compel action on behalf of LSBME, a state actor, establishes that HPFL's conduct can be "fairly attributed to the state."

The same arguments above apply with equal force to PRC and Williams. In conducting its duties through its relationship with LSBME above, HPFL designates part of its responsibility for this state purpose to PRC and Williams by entrusting them to evaluate Louisiana physicians.

---

[75] *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017).

[76] *Id.*

[77] Dkt. 55, at ¶ 9.

[78] *Our History,* HPFL, http://www.HPFL.org/about-hpfl/our-history (last accessed 1/15/2021).

[79] *See, e.g.* Dkt 55, at ¶ 35.

Therefore, actions undertaken by PRC and Williams on behalf of HPFL are by extension taken on behalf of the state and are "fairly attributable to the state." In fact, PRC routinely contracts directly with the medical boards of the states from which it receives referrals.[80] Lastly, the recommendations made by PRC (as outlined in the Amended Complaint) are often acted upon by LSBME without question,[81] rending such recommendations and the evaluations precipitating them attributable to the state.

Defendant Williams fully understands of the importance her reports have for physicians referred to her as well as their conclusory nature with the HPFL. Upon entering the facility in Kansas, Defendant was forced to sign a document permitting disclosure to HPFL.[82] Williams, a professional psychologist who regularly conducts OMPE evaluations is aware that her evaluations are performing a State function of regulating medical licensing. Despite not being a "state employee" in the traditional sense, Plaintiff has alleged facts which show that Defendant Williams is responsible because of her function within the Louisiana system for licensing and regulating medical professionals.

The fact that the Plaintiff contracted with PRC is irrelevant. The US. Supreme Court has explained the analysis in the context of physicians working in a prison.[83] "State employees hired pursuant to a contractual arrangement which do not generate the same benefits or obligations applicable to other 'state employees' does not alter the analysis. It is *the physician's function within the state system*, not the precise terms of h[er] employment, that determines whether h[er] actions

---

[80] For a description of PRC's business model, including its master contracts with state PHPs like HPFL, *see Peterson v. Martinez*, 2017 WL 6418224 (Ct. App. Minn. Dec. 18, 2017).
[81] Dkt. 55, at ¶ 35.
[82] Dt. 96 at Sealed Ex A, p. 10.
[83] *West v. Atkins,* 487 U.S. 42, 55–56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988).

can fairly be attributed to the State."[84] The analysis of the Court in *West* illuminates how the evaluation by Williams is attributable to the state, because that responsibility was delegated to her from the Louisiana legislature through LBSME and HPFL. The Court held that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."[14] The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

Similarly, in this case Williams voluntarily assumed the responsibility of evaluating Louisiana physicians for the LBSME and HPFL and as such, assumed the State's obligations to Duhon.  As such, Duhon may pursue the same constitutional remedies against Williams as he could if Williams were directly employed by the state. Allowing Louisiana to privatize its state functions to escape liability would offer a perverse incentive for the State to privatize all of its functions and would seriously threaten Louisiana citizens' constitutional protections and interests.

### 3.   Sec. 1983 Deprivation – ADA Title II Disability Discrimination Rights (Count 5)

Plaintiff asserts a Section 1983 claim against Williams for deprivation of his ADA Title II rights against disability discrimination.[85] To state a claim under ADA Title II, a plaintiff must allege: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.[86]

---

[84] *Id.*
[85] Dkt. 55 at Count 1, ¶¶ 93-101.
[86] *Hale v. King,* 642 F.3d 492, 499 (5th Cir. 2011).

Regarding the first element, Plaintiff alleged that he had an actual disability as defined by the ADA, namely substance use disorder ("SUD") though in remission since 2011, and he alleged that he was "regarded" as having a "mental" disability by PRC and Williams.[87] Being "regarded as" having a disability is no different than actually having it for purposes of the ADA.[88] Plaintiff repeatedly states that Defendants acted based on the belief of Plaintiff's disability (which is why he is requesting prospective relief to fix those records).[89] For example, Plaintiff's application for a physician's license was halted by the State of Mississippi after it received records from LSBME and/or HPFL that contained disparaging information regarding his disability.[90]

Regarding the second element, Plaintiff was denied benefits by Williams, including but not limited to the good standing of his physicians' license and his clean licensing records.[91] Her report was instrumental for the other Defendants. For example, LSBME discriminated against Plaintiff in several ways, including but not limited to threatening him with emergency suspension of his license if he refused to submit to 60-90 days of inpatient treatment at PRC at his own expense, and disparaging him to the Mississippi medical board which on that basis stopped processing Plaintiff's application for a license in that state.[92] LSBME took all of these steps based on (false) reports authored by Williams, Plaintiff's disability, which cannot be justified by concerns over patient safety as none had been previously cited, Plaintiff's drug and alcohol tests were all clean, and Plaintiff had received two fit for duty evaluations from reputable psychiatrists.[93]

---

[87] Dkt. 55 at ¶¶ 1, 4, 20-42, 45-58.
[88] 42 U.S.C. § 12102(1)(C) and (3).
[89] Dkt. 55 at Count 3 Prayer for Relief (B), p. 22.
[90] Dkt. 55 at ¶ 56.
[91] *Id.* at ¶¶ 3, 4, 59(c), (d).
[92] *Id.* at ¶¶ 48-57.
[93] For a complete summary of specific discriminatory act by Defendant's by reason of Plaintiff's disability, *See* Dkt. 55, at ¶¶ 90(a)-(f).

To the extent that Defendants Williams claims that she is not a "public entity" subject to the requirements of Sec. 1983, her conduct is "fairly attributable to the state." Plaintiff alleges that Defendants discriminated against him on the basis of his disability in ways that include but are not limited to Williams failure to conduct an adequate evaluation,[94] exploiting Plaintiff's past disclosures regarding substance abuse disorder that were in remission to justify further baseless evaluations nonetheless,[95] and failing to stay within the scope of its assignment from HPFL.[96] Accordingly, Williams argument that she did not discriminate against Plaintiff "because of his disability"[97] fails.

### 4. Defendant Williams is not a Party to the Forum Selection Clause

PRC is an addiction treatment center in Lawrence, Kansas.[98] Its motion to sever claims under Rule 21 and transfer them to the District of Kansas under § 1404(a) relies on a forum selection clause in a "Participation Agreement" attached to its supporting memorandum (Dkt. 63-3). The alleged forum selection clause, if it is enforceable, which it is not (*see* Plaintiff's opposition to the Motion to Transfer (Dkt. 85), bears no relevance to Williams. The clause refers to "any dispute arising between Professional Renewal Center and me," but does not refer to disputes between Williams and Plaintiff. Accordingly, Williams, who is being sued in her personal capacity, is not a party to the forum selection clause, and her argument fails.[99] Williams must answer for her violations of federal and Louisiana law.

---

[94] Dkt. 55, at ¶ 41.
[95] *Id.* at ¶¶ 26-27.
[96] *Id.* at ¶ 30.
[97] Dkt 101-2 at 13
[98] Dkt. 55, Plaintiff's Amended Complaint ¶¶ 10, 33.
[99] Dkt. 101-2 at 14.

### 5.      Intentional Infliction of Emotional Distress (Count 6)

Plaintiff asserts an intentional infliction of emotional distress claim against Defendant Williams under Article 2315 of the Louisiana Code.[100] To state a claim for intentional infliction of emotional distress in Louisiana, "a plaintiff must establish that: (1) the conduct of the defendant was extreme and outrageous, (2) the emotional distress suffered by the plaintiff was severe, and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his or her conduct.[101] Where a plaintiff reasonably alleges that wrongful conduct resulted not only in the loss of a job, but the loss of an entire career, "this could be deemed sufficiently severe and outrageous as to allow recovery for intentional infliction of emotional distress" and is best left to the jury as a question of fact.[102]

Here, Plaintiff alleges that Williams' wrongful conduct falsely stained his permanent records at LSU and his licensing records with LSBME in a manner that effectively prevents him from having any reasonable career in medicine.[103] This harm began with Jain's false accusation, and was compounded, amplified and broadcast by Bishop-Baier, Whitfield, HPFL, Hammond, PRC, Williams, and Cresswell.

Plaintiff also alleges a pattern deliberate, repeated harassment over a period of time[104] by Defendants Jain, Bishop-Baier, Whitfield, HPFL, Hammond, PRC, Williams, and Cresswell which under the circumstances of this case should be held to constitute "extreme and outrageous behavior." Jain, Bishop-Baier, and Whitfield knowingly made false accusations regarding

---

[100] Dkt. 55 at Count 1, ¶¶ 102-107.
[101] *Quinlan v. Sugar-Gold*, 51,191, p. 15 (La.App. 2 Cir. 4/5/17); 219 So.3d 1173, 1185.
[102] *Currier v. Entergy Services, Inc*., 73 F.Supp.3d 673, 679 (E.D. La. 2014).
[103] Dkt. 55, ¶¶ 59(a), (b), 56, 60(d), and 83(e).
[104] *Martin v. Am. Midstream Partners, LP*, 386 F. Supp. 3d 733, 742 (ED. La. 2019).

Plaintiff's fitness to practice medicine,[105] unlawfully used private information divulged in confidence against Plaintiff to manufacture justification for Plaintiff's suspension, and adhered to their original accusations despite negative drug screens and what can at best be described as an "inconclusive" evaluation by Whitfield, who abdicated his responsibility to sufficiently evaluate Plaintiff.[106] HPFL, Hammond, LSBME, and Cresswell's conduct was equally outrageous in refusing to accept two fit for duty reports clearing Plaintiff of any mental impairment that would implicate his fitness to practice medicine, and Williams participated in the pattern by insisting on further evaluations despite her inconclusive, even fraudulent, report from her initial evaluation.[107]

Plaintiff suffered severe emotional distress by being subjected to: (1) repeated, invasive, emotionally painful, and adversarial psychological examination in an attempt to appease Defendants;[108] (2) through the loss of his Cardiology fellowship position, Louisiana medical license, and being prevented from obtaining a Mississippi Medical License;[109] and (3) the significant financial harms he suffered by being forced to pay for the aforementioned evaluations and loss of career opportunities.[110] Regarding the final element, Williams knew her actions were certain to cause emotional distress. The Preliminary Assessment and the Discharge Summaries that Williams signed[111] were issued to the HPFL and it is clear from the report itself that Williams knew that the purpose of her report was to identify whether it was appropriate for HPFL take action against Plaintiff's medical license.  False accusations of mental illness, public disclosure of private facts, loss of one's career, medical license, and repeated invasive psychological evaluations could

---

[105] Dkt. 55, at ¶¶ 21-35.
[106] *Id.* at ¶¶ 1, 26, 31.
[107] *Id.* at ¶ at 37.
[108] *See, e.g., id.* at ¶¶ 29, 31, 37, 41, 43, 46.
[109] *Id.* at ¶¶ 3, 37, 56.
[110] *Id.* at ¶¶ 4, 34, 60.
[111] Dkt. 96 at Sealed Exhibit A.

do nothing else.[112] Indeed, the fact that all these interests have been shown to manifest in a protectible liberty or property interest indicate their direct effect on the very core of Plaintiff's well-being. This court has held, as is the case here, that when a defendant's wrongful conduct "did not lead to [Plaintiff's] loss of only . . . one job; [but] destroyed [his] career . . . [it] creates genuine issues of material fact as to its outrageous nature."[113] Plaintiff has sufficiently pled his claim for intentional infliction of emotional distress.

### 6.      Defamation (Count 7)

Plaintiff asserts a defamation claim against Williams under Article 2315 of the Louisiana Code.[114] To state a valid defamation claim, a plaintiff must allege: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury.[115] Fault and injury are presumed where, as here, defamatory statements by their nature tend to injure one's professional reputation.[116] Injury includes harm to reputation, and is not limited to pecuniary harm.[117] The Amended Complaint pleads these elements by alleging that Williams made a false and defamatory

---

[112] Dkt. 55 at ¶¶ 50-61, 104-107.

[113] *Currier*, 73 F.Supp.3d at 679.

[114] Dkt. 55 at Count 7, ¶¶ 108-112.

[115] *Finnie v. LeBlanc*, 2003-1013, p. 10 (La. App. 3 Cir. 3/10/04); 875 So.2d 71, on reh'g (July 7, 2004)).

[116] *Quinlan v. Sugar-Gold*, 51,191, p. 13 (La. App. 2 Cir. 4/5/17); 219 So.3d 1173, 1184 (emphasis added).

[117] *See id.* ("The injury resulting from a defamatory statement may include nonpecuniary or general damages such as injury to reputation, personal humiliation, embarrassment and mental anguish, even when no special damage, such as loss of income, is claimed.").

statements concerning Plaintiff;[118] in unprivileged publications to third parties;[119] negligently and/or intentionally;[120] and with the result of injuring Plaintiff.[121]

Williams contends, incorrectly, that the Complaint fails to state a defamation claim because (1) its knowingly false and injurious statements were "mere opinions."[122] False statements are mere "opinions" only if they are so "purely subjective [that they] can be neither true nor false."[123] Williams' statements about physicians she evaluates are not only capable of being objective and true, they are expected to be accurate. Here, the false statements made by Williams—for example, her statements alleging mental impairment and her statements that Plaintiff was mentally unstable; constituted a threat to patients, co-workers and/or himself; was unfit for duty as a physician; was a substance abuser; and required not one but many psychological evaluations—could not be reasonably considered "purely subjective."[124] Given her position as a psychologist, "ordinary persons" hearing her statements about Plaintiff or reading them in her report "would be likely to understand [them]…as a statement of existing fact."[125] Williams' statements are actionable because, at very least, they defame Plaintiff by implying the existence of false and damaging

---

[118] *See* Dkt. 55, at ¶¶ 4, 20, 26, 37, 40, 41, 42, 45, 49, 56, 57, 58, 67, 74, 82, 83, 90, 110, 111.

[119] *See, e.g.* Dkt. 55, at ¶¶ 30, 40, 50, 56, 58 (showing statements were made without any justification or concerns about patient care).

[120] *Id.* at ¶¶ 1, 21, 25, 28, 45, 46, 49, 50, 52, 54. (showing knowledge of falsity, through negative drug tests, failure to provide justification for accusations, and contradictory evaluations).

[121] *See, e.g. Id.* at ¶¶ 4, 56, 59, 67, 74. *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997) (pertaining to elements of defamation in the Fifth Circuit).

[122] Dkt. 101-2 at 16.

[123] *Purcell v. Tulane Univ. of Louisiana*, 2017 WL 2311735, at *3-4 (E.D. La. May 26, 2017).

[124] *See, e.g.,* Dkt. 55, at ¶¶ 29, 31, 37, 41, 43, 46.

[125] *Sanders v. Dillard Univ*., 2014 WL 7342440, *8 (E.D. La. Dec. 23, 2014).

underlying facts.[126] Finally, it has been held that statements calling to question one's fitness to practice medicine as defamatory per se, irrespective of defamatory intent.[127]

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that Defendant Betsy White Williams' motion to dismiss under Fed. R. Civ. P. 12(b)(2) and 12(b)(6) should be denied in its entirety and his claims against Williams should proceed.

Respectfully submitted,

/s/ Edward R. Moor

Edward R. Moor, T.A. (admitted *pro hac vice*)
(IL Bar No. 6205169)
Moor Law Office, P.C.
One N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 726-6207
erm@moorlaw.net

Jeffrey Weisman (admitted *pro hac vice*)
(IL Bar No. 6295539; DC Bar No. 986696)
Marek Weisman LLC
55 E Monroe Street, Suite 3800
Chicago, Illinois 60603
(312) 470-7662
jweisman@marekweisman.com
and
Kerry Murphy (La. Bar. No. 31382)
Kerry Murphy Law LLC
715 Girod Street, Suite 250
New Orleans, Louisiana 70130
(504) 603-1502
kmurphy@kerrymurphylaw.com

---

[126] *Id.*

[127] *Doe*, 839 So.2d at 415 ("Each of the above statements qualifies as defamatory per se. Each call[] into question Dr. Zamanian's practice as a doctor and whether he had used the appropriate standard of care in the *Mearis* case. It doesn't matter as the defendants suggest, that there was no defamatory intent . . ."); *Quinlan v. Sugar-Gold*, 51,191, p. 13 (La.App. 2 Cir. 4/5/17); 219 So.3d 1173, 1184.