**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**GREGORY DUHON, M.D.**                              **CIVIL ACTION**


**VERSUS**                                          **NO: 20-2022**


**HEALTHCARE PROFESSIONALS'**                       **SECTION "H"**
**FOUNDATION OF LOUISIANA, ET AL.**

## ORDER AND REASONS

Before the Court is Defendant Healthcare Professionals' Foundation of Louisiana's Third Motion to Dismiss Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) (Doc. 160). For the following reasons, the Motion is **GRANTED**.


## BACKGROUND

Plaintiff Gregory Duhon, M.D. brings this action against multiple Defendants for damages and injunctive relief arising from his suspension and termination from the cardiology fellowship program at Louisiana State University ("LSU") and the subsequent loss of his Louisiana medical license. Below are the facts from Plaintiff's Second Amended Complaint that are

relevant to the instant Motion and assumed true for purposes of a motion to dismiss.[1]

Plaintiff, after completing his residency in internal medicine, contracted with LSU to participate in its cardiology fellowship program for the 2018–2019 academic year. During the course of the program, Plaintiff alleges that he began receiving baseless criticisms of his performance and attitude. On May 3, 2019, the cardiology program director, Neeraj Jain, M.D., issued a disciplinary warning and on May 23 referred Plaintiff to LSU's Campus Assistance Program ("CAP") for a fitness-for-duty evaluation based on alleged behavioral impairments. Scott Embley, assistant director of CAP, instructed Plaintiff to submit to an occupationally mandated psychological evaluation ("OMPE") by Defendant Dr. Erik Whitfield, a psychiatrist in private practice who performs evaluations at the request of LSU.

Dr. Whitfield's OMPE of Plaintiff consisted of four one-hour private sessions. After the four sessions, Dr. Whitfield issued a report that said he was unable to decide whether Plaintiff was fit for duty. Dr. Whitfield stated that to be properly evaluated and treated, Plaintiff would need to register with Defendant Healthcare Professionals' Foundation of Louisiana ("HPFLA"), a non-profit corporation created by the Louisiana State Board of Medical Examiners ("LSBME") for the sole purpose of "oversee[ing] the evaluation, treatment, and monitoring of impaired or potentially impaired physicians."[2]

---

[1] *See* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

[2] Doc. 131, ¶ 3.

Dr. Whitfield sent his report to CAP, who then instructed Plaintiff to report to HPFLA.[3]

Plaintiff did as CAP instructed, and upon registering with HPFLA, the case manager there, Felix Vanderlick, directed Plaintiff to report to one of three treatment centers to undergo a more comprehensive psychological exam at Plaintiff's expense. HPFLA told Plaintiff that it would report him to LSBME if he failed to comply with these instructions and that as a result, he could lose his Louisiana medical license. Of the three options, Plaintiff chose Defendant Professional Renewal Center ("PRC") in Lawrence, Kansas and went there in July 2019.

After examining Plaintiff for three days, PRC rendered an allegedly sham report that diagnosed past ADHD and past substance abuse disorder, among other baseless "behavioral traits" that Plaintiff apparently needed to address with counseling. PRC's report recommended further treatment, which Plaintiff claimed was likely to cost him more than $50,000.

PRC sent its report to HPFLA, and HPFLA's employee, Mr. Vanderlick, purportedly told Plaintiff "that PRC's report was incorrect, was a sham and possibly even fraudulent because Plaintiff had no mental illness and told Plaintiff that if he just went to his friend's shop, [The Renewal Center ("TRC")] in Baton Rouge, Louisiana, a substance abuse treatment facility, that HPFLA would report him as being compliant."[4] Despite allegedly knowing of the unreliability of PRC's report, HPFLA threatened to report Plaintiff to LSBME

---

[3] *Id.* ¶ 22.
[4] *Id.* ¶ 31.

if he did not comply with PRC's recommendation. Plaintiff refused to comply because he could not afford the treatment and did not believe it was medically necessary.

In September 2019, HPFLA reported to LSBME that Plaintiff was not compliant with its or PRC's recommendations. That same month, Plaintiff sought and obtained his own private psychological examinations from two psychiatrists who identified flaws in the PRC report and expressed full confidence that Plaintiff was fit to practice medicine. HPFLA refused to consider the results of these examinations or their criticisms of the PRC report. In a final effort to satisfy HPFLA and LSBME, Plaintiff met with TRC, but TRC also refused to review Plaintiff's expert reports, leading him to decline any further treatment. On February 20, 2020, Plaintiff's attorneys wrote to HPFLA demanding it close Plaintiff's file and advise LSBME that there was no basis for further review of or action against his medical license. HPFLA never responded to this letter. In July 2020, rather than undergo further treatment that he did not deem necessary or cost efficient, Plaintiff allowed his medical license to expire.

In this action, Plaintiff brings claims against a number of Defendants, including HPFLA, for violations of procedural and substantive due process under 42 U.S.C. § 1983 and for intentional infliction of emotional distress and defamation. Now before the Court is HPFLA's Third Motion to Dismiss all of

Plaintiff's claims against it under Federal Rule of Civil Procedure 12(b)(6).[5] Plaintiff opposes.[6]

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim for relief that is plausible on its face."[7] A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[8] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[9] The court need not, however, accept as true legal conclusions couched as factual allegations.[10] To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[11] If it is apparent from the face of the complaint that an insurmountable bar to relief exists and the plaintiff is not entitled to relief, the court must dismiss the claim.[12] The court's review is limited to the complaint and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.[13]

---

[5] Doc. 160.
[6] Doc. 169.
[7] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 547).
[8] *Id.*
[9] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).
[10] *Ashcroft*, 556 U.S. at 678.
[11] *Id.*
[12] *Lormand*, 565 F.3d at 255–57.
[13] Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).

## LAW AND ANALYSIS

In its Motion to Dismiss, HPFLA asks the Court to dismiss Plaintiff's three claims: (1) deprivation of procedural and substantive due process in violation of § 1983, (2) intentional infliction of emotional distress, and (3) defamation.[14] The Court will discuss each claim in turn.

## I.  Deprivation of Substantive and Procedural Due Process Under 42 U.S.C. § 1983

"To state a claim under § 1983, plaintiffs must allege two elements: first that they were deprived of a right or interest secured by the Constitution and laws of the United States, and second that the deprivation occurred under color of state law."[15] Here, Plaintiff alleges that HPFLA was acting under color of state law when depriving him of his constitutional right to due process under the Fourteenth Amendment.

HPFLA argues that Plaintiff fails to allege sufficient facts to meet either element of a § 1983 claim.[16] First, HPFLA contends that it is a private, non-profit corporation that is not a state actor for purposes of § 1983. Alternatively, HPFLA avers that even if it is a state actor, it is entitled to qualified immunity. Second, HPFLA argues that it did not deprive Plaintiff of any interests protected by statutes or the Constitution.

This Court has previously declined to dismiss HPFLA on the grounds that it is a private entity immune to § 1983 liability.[17] HPFLA, a non-profit

---

[14] Doc. 160. See Doc. 131, ¶¶ 59–86 for Plaintiff's claims.
[15] Doe v. Rains Cnty. Indep. Sch. Dist., 66 F.3d 1402, 1406 (5th Cir. 1995).
[16] *See* Doc. 160-1 at 9–25.
[17] *See* Doc. 123 at 11 ("The Court finds that Plaintiff has sufficiently alleged that HPFLA is fairly attributable to the state . . . .").

private entity, was created by LSBME, a state entity, for the sole purpose of overseeing the evaluation, monitoring, and treatment of impaired or potentially impaired physicians. Whether HPFLA is a state actor is a close call. Assuming arguendo that it is, this Court nonetheless finds dismissal appropriate on the grounds of qualified immunity. The Court first considers the threshold question of whether HPFLA can assert qualified immunity, and, finding it able to do so, the Court subsequently analyzes whether Plaintiff can defeat this immunity.

### A.    Whether HPFLA Is Entitled to Raise Qualified Immunity

"Private actors may, under some circumstances, be liable under § 1983, but it does not necessarily follow that they may assert qualified immunity."[18] Notwithstanding that neither party addresses the issue, the Court cannot ignore that "[t]he law is not established in this circuit, however, as to whether private *entities* . . . are entitled to the protections of qualified immunity."[19] While it is clear that, under certain circumstances, *employees* of private entities acting under color of state law are eligible to raise qualified immunity, there is a circuit split as to whether the private *entities* themselves are so eligible.[20] The Fifth Circuit has not weighed in on this dispute.

---

[18] Perniciaro v. Lea, 901 F.3d 241, 251 (5th Cir. 2018) (citing West v. Atkins, 487 U.S. 42, 54–57 (1988); Wyatt v. Cole, 504 U.S. 158, 168–69 (1992)).

[19] Walter v. Horseshoe Ent., 483 Fed. Appx. 884, 886 n.3 (5th Cir. 2012) (emphasis added); *see also* May v. Strain, 55 F. Supp. 3d 885, 900 (E.D. La. 2014).

[20] *See* United Pet Supply, Inc. v. City of Chattanooga, 786 F.3d 464, 484 n.3 (6th Cir. 2014), *cert denied*, 575 U.S. 1046 (2015).

The Second, Third, Seventh, and Tenth Circuits have at least allowed private entities to raise qualified immunity on some occasions.[21] Their rationale seems to be that the reasons for extending qualified immunity to private employees under certain conditions should also apply to private employers under those same conditions. As the Tenth Circuit noted in *DeVargas v. Mason & Hanger-Silas Mason Co.*, "A nonimmune contractor defendant would be required to bear the total cost of plaintiff's injury, regardless of the objective reasonableness of its acts. In addition, denying immunity would make contractor defendants—whether individual or corporate—more timid in carrying out their duties and less likely to undertake government service."[22]

By contrast, the Sixth, Ninth, and Eleventh Circuits have determined that private entities are generally unable to assert qualified immunity.[23] Their

---

[21] *See* Fabrikant v. French, 691 F.3d 193 (2d Cir. 2012) (allowing a non-profit, private animal-rescue organization to raise qualified immunity); Shipley v. First Fed. Sav. Bank & Loan Ass'n of Del., 877 F.2d 57 (3d Cir. 1989) (Table) (affirming district court's holding that a private bank, even if found to be a state actor, "would still be entitled to assert a defense of qualified immunity"); Sherman v. Four Cnty. Couns. Ctr., 987 F.2d 397 (7th Cir. 1993) (finding "no persuasive reason to distinguish between a private corporation and a private individual" with respect to an analysis of qualified immunity); Rosewood Servs. Inc. v. Sunflower Diversified Servs., Inc., 413 F.3d 1163, 1166 (10th Cir. 2005) (citing DeVargas v. Mason & Hanger-Silas Mason Co., 844 F.2d 714, 723 (10th Cir. 1988)) (reiterating the rule from *DeVargas* that "there is no bar against a private corporation claiming qualified immunity"); Weigan v. Spadt, 317 F. Supp. 2d 1129 (D. Neb. 2004) (allowing for the possibility that Emergency Medical Services, Inc. is entitled to qualified immunity).

[22] *DeVargas*, 844 F.2d at 723.

[23] *See United Pet Supply, Inc.*, 768 F.3d 464 (comparing private, non-profit corporation to municipality and prohibiting it from asserting qualified immunity); Halvorsen v. Baird, 146 F.3d 680 (9th Cir. 1998) (finding private, non-profit detoxification organization not entitled to immunity); Swann v. S. Health Partners, Inc., 388 F.3d 834 (11th Cir. 2004) (a private entity contracting with the state could not raise immunity). The Court uses the word "generally" on purpose because no case from any of these three circuits has

rationale rests on an analogy between private entities and municipalities.[24] As one district court explained, "Private corporations that enter contracts to provide traditionally public services are functionally equivalent to municipalities for purposes of § 1983 suits and, like municipalities, they are not entitled to claim qualified immunity."[25]

This Court decides that, only with respect to the facts before it, there is no reason to distinguish between HPFLA employees and the entity itself.[26] This conclusion is supported by the fact that any analogy between a municipality and HPFLA is tenuous at best. Courts that have equated private corporations with municipalities did so because of the former's provision of "traditionally public services."[27] By contrast, HPFLA only contracts with LSBME to provide a highly specific, discrete function—monitoring potentially impaired physicians—which is not traditionally an exclusively public service.[28] Moreover, unlike a municipality, HPFLA, a small non-profit, cannot draw from

definitively stated that private entities cannot raise the defense of qualified immunity simply by virtue of being entities rather than individuals.

[24] *See United Pet Supply, Inc.*, 768 F.3d at 483–84.

[25] Ray v. Jud. Corr. Servs., Inc., 270 F. Supp. 3d 1262, 1291 (N.D. Ala. 2017) (citation omitted) (citing *Swann*, 388 F.3d at 837).

[26] At least one other court reached a similar conclusion about members of the North Carolina Physician Health Program. *See* Manion v. N.C. Med. Bd., No. 5:16-CV-63, 2016 WL 4523902, at *6 (E.D.N.C. Aug., 22, 2016) ("The members of the PHP and the Medical Board are also protected by qualified immunity.") For greater justification for the similarity between HPFLA and its employees, see the Court's discussion in Section I.A.ii below.

[27] *Ray*, 270 F. Supp. 3d at 1291.

[28] HPFLA's function, namely, monitoring the treatment of physicians suspected of being impaired, is not one that historically was exclusively reserved to the state. *See* Gary D. Carr et al., *Physician Health Programs: The US Model*, *in* PHYSICIAN MENTAL HEALTH AND WELL-BEING: RESEARCH AND PRACTICE 265, 267 (Kirk J. Brower & Michelle B. Riba eds., 2017) ("Early [physician health programs] were volunteer groups of 'physicians helping physicians' who limited their work to physicians with [substance abuse disorders].")

a public treasury to pay judgments. This Court, therefore, finds the rationale in *DeVargas* persuasive as it relates to this case and adopts the same here. Importantly, the Court notes that its conclusion may well be different when presented with an alternative set of facts.

Having concluded that there is no principled reason to prevent HPFLA from raising qualified immunity by virtue of its status as an entity, the Court must now determine whether it passes muster under the usual test for whether private actors are eligible to raise qualified immunity. Whether a private actor can do so depends on two factors: "(1) principles of tort immunities and defenses applicable at common law around the time of § 1983's enactment in 1871 and (2) the purposes served by granting immunity."[29] Although Plaintiff raises no argument as to why HPFLA should not be entitled to assert qualified immunity,[30] the Court must still determine whether the common law principles of 1871 or the policy considerations behind qualified immunity justify allowing HPFLA to assert the defense.

### i.   *Immunities and Defenses at Common Law in 1871*

HPFLA is an organization that assists with Louisiana's "physician health program," or PHP. "Physician health programs are resources for physicians, other health care professionals, and those in medical training who suffer from potentially impairing conditions, ranging from [substance abuse disorders] to a wide range of medical, behavioral, and psychiatric problems."[31]

---

[29] *Perniciaro*, 901 F.3d at 251 (citing Filarsky v. Delia, 566 U.S. 377, 383–84 (2012); Richardson v. McKnight, 521 U.S. 399, 403–04 (1997)).
[30] *See* Doc. 175 at 8.
[31] Robert L. DuPont & Lisa J. Merlo, *Physician Health Programs: A Model for Treating Substance Use Disorders*, 57.1 Judges' J. 32, 33 (2018).

The first PHPs in America surfaced in the 1970s and 1980s.[32] Since PHPs did not exist in 1871, there was no "'firmly rooted' tradition of immunity" for organizations similarly situated to HPFLA when § 1983 was enacted. This finding counsels against allowing HPFLA to assert qualified immunity.[33] The Court now turns to the second factor, the purposes behind qualified immunity.

### ii.  *The Purposes Served by Granting Qualified Immunity*

Here,

> The Supreme Court has identified three purposes served by qualified immunity: (1) preventing unwarranted timidity in the exercise of official duties; (2) ensuring that highly skilled and qualified candidates are not deterred from public service by the threat of liability; and (3) protecting public employees—and their work—from all of the distraction that litigation entails.[34]

HPFLA argues that allowing it to assert qualified immunity would serve each of these three purposes.[35] First, HPFLA notes that it is not a large, for-profit entity with competition from other firms offering similar services. As a result, there are no "ordinary marketplace pressures" that "suffice to incentivize

---

[32] *See* Gary D. Carr et al., *Physician Health Programs: The US Model*, *in* PHYSICIAN MENTAL HEALTH AND WELL-BEING: RESEARCH AND PRACTICE 265, 266–68 (Kirk J. Brower & Michelle B. Riba eds., 2017).

[33] The most faithful interpretation of relevant precedent from the U.S. Supreme Court and the Fifth Circuit dictates that the history and policy factors need not both weigh in favor of immunity in order to allow the private defendant to assert qualified immunity. *See Richardson*, 521 U.S. at 407 (analyzing policy concerns even after concluding that "history [did] not provide significant support for the [defendants'] immunity claim"); Sanchez v. Oliver, 995 F.3d 461, 469 (5th Cir. 2021) (applying the policy purposes behind qualified immunity to the case at hand despite finding "no sufficient historical traditional of immunity at common law").

[34] *Perniciaro*, 901 F.3d at 253.

[35] *See* Doc. 160-1 at 26–28.

vigorous performance and prevent unwarranted timidity."[36] Second, HPFLA notes that qualified candidates would be discouraged from working there without qualified immunity, especially when working in close proximity to LSBME employees who receive the benefit of immunity. Third, HPFLA argues that because its employees work alongside LSBME's public employees, litigation against the former necessarily affects the latter to some extent as well. Plaintiff fails to respond to these arguments.

This Court believes that allowing HPFLA to assert qualified immunity advances the doctrine's three purposes. First, with respect to preventing unwarranted timidity—"the most important special government immunity-producing concern"—courts focus on the presence or absence of market forces.[37] In *Richardson v. McKnight*, the Supreme Court held that prison guards employed by a large, private prison-management firm are not entitled to assert qualified immunity.[38] There, the Court found that the firm was "systematically organized to perform a major administrative task for profit," it did so "independently, with relatively less ongoing direct state supervision," and it "face[d] threats of replacement by other firms" with better performance records.[39] These features made the firm susceptible to market pressures that allowed it to combat unwarranted timidity in a way that a public employer,

---

[36] *Perniciaro*, 901 F.3d at 253.
[37] *Richardson*, 521 U.S. at 409.
[38] *Id.* at 403–04; *see also Sanchez*, 995 F.3d at 467–72 (holding that private social worker employed by organization systematically arranged to provide medical services in a correctional setting was ineligible to assert qualified immunity).
[39] *Id.* at 409.

constrained by "institutional rules and regulations," could not without the benefit of qualified immunity.[40]

Those market forces are not at play here. HPFLA, a non-profit corporation, has been the only entity to provide monitoring services for the LSBME for more than 20 years.[41] Indeed, HPFLA was created by LSBME for this specific purpose, and there are no other organizations competing with HPFLA for its privileged status.[42] HPFLA indicates—and Plaintiff's allegations confirm—that it hardly works "independently" from LSBME; instead, the two operate in concert. HPFLA does not at all resemble the large, for-profit, sophisticated firm in *Richardson* that is especially well-suited to discourage overly timid work without the assistance of qualified immunity. The threat of bearing the cost of plaintiffs' injuries, regardless of the objective reasonableness of HPFLA's conduct, would no doubt make the organization more timid in exercising its official duties.

Second, as for minimizing deterrence of talented candidates towards public service, HPFLA is likely to have difficulty doing so without qualified immunity. *Filarksy v. Delia* is illustrative on this point.[43] There, the Supreme Court held that a private attorney retained by a city to conduct an internal affairs investigation could seek the protection of qualified immunity.[44] Discussing this second policy consideration, the Court explained that the concern over deterrence is especially acute where private employees work

---

[40] *Perniciaro*, 901 F.3d at 253.
[41] *See* Doc. 160-1 at 26–27.
[42] *Id.*
[43] 566 U.S. 377 (2012).
[44] *Id.* at 394.

closely with public employees.[45] In those cases, "[b]ecause government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity."[46]

According to Plaintiff's allegations, HPFLA was in close contact with LSBME throughout the period of investigation. Talented individuals trained in facilitating treatment for substance abuse disorders and other impairments may take their professional skills elsewhere if LSBME and its employees enjoy an immunity that HPFLA does not. The prospect of HPFLA being liable for costly money judgments would no doubt dampen its ability to attract promising candidates considering working there. HPFLA's resources would be drained paying judgments and the costs of litigation instead of salaries and benefits that attract candidates. Private firms "can offset the risk of litigation and liability with higher pay or better benefits."[47] As a small, non-profit corporation, HPFLA cannot do the same without qualified immunity.

Third and finally, immunity for HPFLA would protect public employees at LSBME from the distractions of litigation. As explained in *Filarsky*, "the distraction of a lawsuit against a private individual will 'often also affect public employees with whom they work by embroiling those employees in litigation.'"[48] This case illustrates as much. Without qualified immunity, suits

---

[45] *Id.* at 391.
[46] *Id.*
[47] *Perniciaro*, 901 F.3d at 254 (citing *Richardson*, 521 U.S. at 411).
[48] *Id.* (quoting *Filarsky*, 566 U.S. at 391).

against HPFLA are likely to embroil LSBME employees in the litigation because of the close working relationship between the two organizations.

Given the above policy considerations and Plaintiff's failure to dispute their application in HPFLA's favor, the Court finds that HPFLA is entitled to assert the defense of qualified immunity.[49] The burden therefore shifts to Plaintiff to overcome this immunity.

## B.     Whether Plaintiff Can Overcome Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[50] "Once invoked, a plaintiff bears the burden of rebutting qualified immunity by showing two things: (1) that the officials violated a statutory or constitutional right and (2) that the right was 'clearly established at the time of the challenged conduct.'"[51] "Law is 'clearly established' for these purposes only if 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right.'"[52] Ultimately, a plaintiff must show that "no reasonable officer would have believed his actions were proper."[53]

---

[49] *See supra* note 17.

[50] Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted)).

[51] *Perniciaro*, 901 F.3d at 255 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (internal quotations omitted)).

[52] *Id.* (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

[53] Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010).

HPFLA argues that Plaintiff cannot show any violation of a clearly established statutory or constitutional right.[54] Plaintiff responds that he has carried his burden to overcome qualified immunity because "the case law was . . . clearly established at all relevant times that a medical license is a property interest under the constitution [sic] that cannot be taken without due process."[55] Plaintiff notes his Complaint charges HPFLA with constructively terminating his license by effectively forcing him to surrender it through its unreasonable demands for compliance. Drawing on the employment-law doctrine of constructive discharge, Plaintiff's theory analogizes HPFLA's conduct to an employer whose actions are so hostile towards an employee that she is forced to resign.[56] HPFLA counters that Plaintiff is unable to cite a single case in which constructive termination applies to a professional license.[57]

Plaintiff misapprehends the relevant inquiry and argues that to overcome qualified immunity, he need only allege a deprivation of a right that is clearly established under the Constitution. "The dispositive question is 'whether the violative nature of *particular conduct* is clearly established.'"[58] The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."[59] The question here, then, is whether it is clearly established that a PHP reporting a physician's non-compliant behavior and requiring additional psychological treatment such that

---

[54] *See* Doc. 160-1 at 28.
[55] Doc. 169 at 11.
[56] *See id.* at 4–5.
[57] *See* Doc. 175 at 8–9.
[58] *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742) (emphasis added); *see also Perniciaro*, 901 F.3d at 256.
[59] *al-Kidd*, 563 U.S. at 742.

the physician allows his license to lapse violates a constitutional right. Plaintiff cites no case law to this effect. Without more, the Court cannot say that the violative nature of HPFLA's conduct is clearly established. The Court, therefore, finds that HPFLA is entitled to qualified immunity.

## II.   Intentional Infliction of Emotional Distress

Plaintiff next asserts a claim against HPFLA for intentional infliction of emotional distress ("IIED"). Specifically, Plaintiff alleges that the following actions by HPFLA caused him emotional distress: (1) "being coerced repeatedly to undergo further psychological examinations even though a) PRC's exam was acknowledged as being unreliable even by the HPFLA, and b) Plaintiff's independent examiners found him fit for duty" and (2) "HPFLA's reports to the LSBME that Plaintiff was 'noncompliant' and its threats to report him as noncompliant in order to coerce further psychological examinations."[60]

"[T]o recover for intentional infliction of emotional distress, a plaintiff must establish that: (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."[61] To succeed on this claim, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

---

[60] Doc. 131, ¶¶ 68, 71. Plaintiff also alleges that "having his medical license threatened in Louisiana, and denied in Mississippi" constituted IIED by HPFLA. *Id.* ¶ 68. These allegations do not apply to HPFLA, however; only LSBME and its Mississippi equivalent can take action as to a medical license in Louisiana or Mississippi respectively.

[61] White v. Monsanto, 585 So. 2d 1205, 1209 (La. 1991).

civilized community."[62] "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[63]

HPFLA argues that Plaintiff's allegations do not satisfy any element of an IIED claim.[64] First, HPFLA contends that its conduct was not extreme or outrageous because it had legitimate reason for concern based on Dr. Whitfield's report. Second, HPFLA notes that Plaintiff only alleges that his distress was "severe" and "extreme," without any facts to support those conclusions. Third, HPFLA identifies Plaintiff's allegations as to its intent as similarly conclusory.

This Court finds that Plaintiff has failed to allege sufficient facts to meet the second and third elements of IIED. Plaintiff does not present facts that indicate his emotional distress was severe. It is not sufficient to assert severe emotional distress in a conclusory fashion without any facts supporting that allegation, as Plaintiff does.[65] Plaintiff's allegation as to HPFLA's intent to inflict emotional distress is similarly conclusory.[66] Thus, this Court finds that Plaintiff has failed to meet the high bar for IIED claims in Louisiana, and his claim is dismissed.

---

[62] *Id.*

[63] *Id.*

[64] *See* Doc. 160-1 at 31–35.

[65] *See* Wilson v. Ochsner Clinic Found., No. 19-12314, 2019 WL 5693109, at *7 (E.D. La. Nov. 4, 2019) ("Furthermore, the second element of intentional infliction of emotional distress requires Plaintiff to prove symptoms of emotional distress like 'neuroses, psychoses, chronic depression, phobia, and shock.' Plaintiff does not plead any facts — visits to health care providers as result of the emotional stress, physical symptoms resulting from the emotional distress — that would allow him to prove he suffered actual severe emotional distress.").

[66] *See* Doc. 131, ¶ 75.

18

## III.   Defamation

Lastly, Plaintiff brings a claim of defamation against HPFLA. Specifically, Plaintiff alleges that "HPFLA's statements to the LSBME that the Plaintiff was 'noncompliant' were false."[67] HPFLA responds that this statement was not false and therefore not defamatory.[68]

Under Louisiana law, the elements of a defamation claim include: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury."[69] This Court agrees with HPFLA that its statement about Plaintiff's noncompliance was not false. Even taking all of Plaintiff's allegations as true, HPFLA's statement appears true. Nowhere does Plaintiff allege that he complied with PRC or HPFLA's recommendations. In fact, he admits that he did not comply.[70] Thus, Plaintiff has not alleged a false statement on HPFLA's part, and the Court must dismiss Plaintiff's defamation claim.

---

[67] *Id.* ¶ 81. Another allegation warrants attention here. Plaintiff alleges, "Upon information and belief, [the suspension of the processing of Plaintiff's application for a Mississippi medical license] was the result of a defamatory false report to the Mississippi board by the LSBME, Cresswell and/or by HPFLA based on the false record created by Defendants." *Id.* ¶ 48. This allegation fails to satisfy the requirement that "[a] petitioner alleging a cause of action for defamation must set forth in the petition with reasonable specificity the defamatory statements allegedly published by the defendant." Lusich v. Capital One, ACP, LLC, 198 So. 3d 1272, 1277 (La. App. 4th Cir. 2016) (quoting Fitzgerald v. Tucker, 737 So. 2d 706, 713 (La. 1999) (internal quotations omitted). Although the exact words are not required, Plaintiff has not even provided "reasonable specificity." Badeaux v. Sw. Comput. Bureau, Inc., 929 So. 2d 1211, 1218 (La. 2006).

[68] *See* Doc. 160-1 at 35–38.

[69] Bellard v. Gautreaux, 675 F.3d 454, 464 (5th Cir. 2012) (citing Costello v. Hardy, 864 So. 2d 129, 139 (La. 2004)).

[70] *See* Doc. 131, ¶¶ 44–49.

"[U]nless futile, courts generally allow one chance to amend deficient pleadings before dismissing with prejudice."[71] Here, Plaintiff has already amended his Complaint on two separate occasions, and the Court finds that further amendment would be futile.

## **CONCLUSION**

For the foregoing reasons, HPFLA's Third Motion to Dismiss Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) (Doc. 160) is **GRANTED.**

**IT IS ORDERED** that all of Plaintiff's claims against HPFLA are hereby **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 12th day of April, 2022.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[71] Buc-ee's, Ltd. v. Bucks, Inc., 262 F. Supp. 3d 453, 467 (S.D. Tex. 2017) (citing Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002)).